No. 25-3845

IN THE

# United States Court of Appeals
# for the Sixth Circuit

JEREMY QUINN, JR.,

*Plaintiff-Appellant*,

v.

JOHN/JANE DOE, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Ohio
No. 3:22-cv-00661-DAC
Hon. Darrell A. Clay, U.S.M.J.

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

NEAL KUMAR KATYAL
JESSICA C. HUANG
  *Counsel of Record*
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7595
jhuang@milbank.com

March 17, 2026
*Counsel for Plaintiff-Appellant*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3845          Case Name: Quinn Jr. v. Doe, et al.

Name of counsel: Jessica C. Huang

Pursuant to 6th Cir. R. 26.1, pro bono counsel on behalf of Appellant Jeremy Quinn, Jr.
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

Pro bono counsel on behalf of Appellant Jeremy Quinn, Jr. is not aware of any such party.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

Pro bono counsel on behalf of Appellant Jeremy Quinn, Jr. is not aware of any such party.

### CERTIFICATE OF SERVICE

I certify that on _____ March 17, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jessica C. Huang

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**TABLE OF CONTENTS**

Page

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

JURISDICTIONAL STATEMENT ..................................................................2

INTRODUCTION ........................................................................................2

STATEMENT OF THE ISSUE FOR REVIEW ..................................................9

STATEMENT OF THE CASE..........................................................................9

    A.    Factual Background.................................................................9

    B.    Procedural History................................................................14

SUMMARY OF ARGUMENT ......................................................................19

STANDARD OF REVIEW ..........................................................................26

ARGUMENT .............................................................................................27

I.    A Prisoner Does Not Forfeit His Constitutional Protections At The Prison Gate, And This Court Has Recognized As Much In The Legal-Mail Context..................................................................................27

II.    The District Court's Application of *Turner* To Overturn *Sallier*'s Holding Is Wrong In The First Instance .................................................29

    A.    The District Court Wrongly Upheld The Control-Number Policy Under *Turner*'s Multi-Factor Test, Despite This Court's Holding In *Sallier* That Court Mail Cannot Be Opened And Read Outside The Presence Of A Prisoner Who Has Requested Otherwise ....................32

III.    The District Court's *Turner* Analysis Is Wrong............................................35

    A.    There Is No Valid, Rational Connection Between The Control-Number Policy And The Interest In Combatting The Conveyance Of Contraband .................................................35

Page

    B.    The Remaining *Turner* Factors Further Prove The Unreasonableness Of The Policy ...................................................................................43

        1.    There Are No Alternative Means Of Exercising Their First Amendment Right To Legal Mail That Remain Open To Prisoners ................................................................................43

        2.    Accommodation Of Prisoners' First Amendment Rights Will Have Minimal Impact On Guards And Other Prisoners, And On The Allocation Of Prison Resources Generally ........................49

        3.    There Are Obvious, Easy Alternatives To The Control-Number Policy That Fully Accommodate Prisoners' Rights At *De Minimis* Cost To Penological Interests ....................................52

CONCLUSION ......................................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*ACLU Fund of Mich. v. Livingston County,*
796 F.3d 636 (6th Cir. 2015) ...............................................................23, 24, 39, 43

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...............................................................................................26

*B.F. Goodrich Co. v. U.S. Filter Corp.,*
245 F.3d 587 (6th Cir. 2001) .............................................................................26, 27

*Beard v. Banks,*
548 U.S. 535 (2006) ...............................................................................................31

*Bell v. Wolfish,*
441 U.S. 520 (1979) ...............................................................19, 21, 27, 32

*Cleavinger v. Saxner,*
474 U.S. 193 (1985) ...............................................................................................31

*Cooper v. Pate,*
378 U.S. 546 (1964) ...............................................................................................27

*Cruz v. Beto,*
405 U.S. 319 (1972) ...............................................................................................27

*Demis v. Sniezek,*
558 F.3d 508 (6th Cir. 2009) ...............................................................................11

*Figel v. Overton,*
121 F. App'x 642 (6th Cir. 2005) .........................................................................30

*Flagner v. Wilkinson,*
241 F.3d 475 (6th Cir. 2001) .............................................................21, 32, 35, 53

*Fontroy v. Beard,*
559 F.3d 173 (3d Cir. 2009) .............................................................45, 46, 47, 48

Page(s)

*Haight v. Thompson*,
763 F.3d 554 (6th Cir. 2014) ........................................................40

*Hanrahan v. Mohr*,
905 F.3d 947 (6th Cir. 2018) ...................................................31, 43

*Huckaby v. Priest*,
636 F.3d 211 (6th Cir. 2011) ........................................................26

*Johnson v. Avery*,
393 U.S. 483 (1969).......................................................................27

*Kensu v. Haigh*,
87 F.3d 172 (6th Cir. 1996) ...........................................19, 20, 28

*King v. Aramark Corr. Servs.*,
No. 2:23-cv-156, 2024 WL 3461784
(S.D. Ohio Mar. 22, 2024) ............................................................13

*Knop v. Johnson*,
977 F.2d 996 (6th Cir. 1992) ...................................................39, 40

*Lavado v. Keohane*,
992 F.2d 601 (6th Cir. 1993) .......................................23, 24, 39, 43

*Lee v. Washington*,
390 U.S. 333 (1968).......................................................................27

*Lyons v. Stovall*,
188 F.3d 327 (6th Cir. 1999) ........................................................42

*McElhaney v. Elo*,
202 F.3d 269 (6th Cir. 2000) ...................................................30, 31

*Meachum v. Fano*,
427 U.S. 215 (1976).................................................................27, 28

Page(s)

*Muhammad v. Pitcher*,
35 F.3d 1081 (6th Cir. 1994) ........................................20, 28, 29, 43

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .................................................................42

*Parrish v. Johnson*,
800 F.2d 600 (6th Cir. 1986) ...........................................30, 39

*Pell v. Procunier*,
417 U.S. 817 (1974)..............................................21, 27, 32, 35, 53

*Procunier v. Martinez*,
416 U.S. 396 (1974)...................................................................9

*Rudisill v. Ford Motor Co.*,
709 F.3d 595 (6th Cir. 2013) ...............................................26

*Sallier v. Brooks*,
343 F.3d 868 (6th Cir. 2003) ........... 1, 3, 6, 16, 17, 19, 20, 22, 23, 28, 29, 33, 34

*Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrecoverable Tr.*,
410 F.3d 304 (6th Cir. 2005) ...............................................26

*State v. Brooks*,
No. 24CA27, 2025 WL 1190151
(Ohio Ct. App. Apr. 21, 2025)...........................................47, 48

*Stover v. Carlson*,
413 F. Supp. 718 (D. Conn. 1976)........................................28, 29

*Straughter v. Eddy*,
No. 2:23-cv-1268, 2023 WL 6290069
(S.D. Ohio Sep. 27, 2023)......................................4, 12, 24, 25, 43, 44

*Taft Broad. Co. v. United States*,
929 F.2d 240 (6th Cir. 1991) ...............................................26, 27

Page(s)

*Turner v. Safley*,
  482 U.S. 78 (1987)....................................... 5, 6, 8, 9, 18, 20, 21, 23, 24, 25, 26,
  29, 30, 31, 32, 35, 36, 37, 38, 39, 40,
  41, 42, 43, 49, 51, 52, 53, 54

*Walker v. Sumner*,
  917 F.2d 382 (9th Cir. 1989) ...................................................................31

*Wolff v. McDonnell*,
  418 U.S. 539 (1974)......................................................................8, 19, 27, 28

**FILINGS:**

Ex. E to Pet. for Writ of Mandamus,
  *State ex rel. Miller v. Foley*,
  No. 2022-1521 (Ohio Dec. 12, 2022) ..........................................................43, 44

Joint Status Rep. in Response to Order,
  Dkt. No. 93, *Allah v. Chambers-Smith*,
  No. 2:22-cv-21-EAS-KAJ (S.D. Ohio July 11, 2024).......................................41

Login Instructions,
  Dkt. No. 36-11, *Brown v. Chambers-Smith*,
  No. 2:22-cv-2469 (S.D. Ohio Dec. 6, 2022).......................................................12

Mot. to Have Clerk of Court Seek a "Control Number",
  Dkt. No. 14, *King v. Aramark Corr. Servs.*,
  No. 2:23-cv-156 (S.D. Ohio July 26, 2023) .......................................................13

Order & R. & R.,
  Dkt. No. 9, *Swain v. Chambers-Smith*,
  No. 2:23-cv-2809 (S.D. Ohio Dec. 19, 2023).....................................................47

Order Concerning Mail from this Ct.,
  Dkt. No. 38, *Kendrick v. Chambers-Smith*,
  No. 1:22-cv-170 (S.D. Ohio Jan. 25, 2024).......................................................48

Order,
Dkt. No. 44, *Swain v. Chambers-Smith*,
No. 2:23-cv-2809 (S.D. Ohio Dec. 3, 2024)....................................................47, 48

Stipulated Order Regarding Legal Mail from Fed. Cts.,
Dkt. No. 91, *Allah v. Chambers-Smith*,
No. 2:22-cv-21-EAS-KAJ (S.D. Ohio June 25, 2024) ...............................24, 41

Stipulation of Dismissal *with Prejudice*,
Dkt. No. 99, *Allah v. Chambers-Smith*,
No. 2:22-cv-21-EAS-KAJ (S.D. Ohio Oct. 18, 2024)........................................42

STATUTES:

28 U.S.C § 1291 ...............................................................................................2

28 U.S.C. § 1331 ...............................................................................................2

42 U.S.C. § 1983 ...............................................................................................2

OHIO REV. CODE ANN. § 121.01 *et seq.* (West 2026) .................................10

OHIO REV. CODE ANN. § 5120.01 *et seq.* (West 2026) ...........................10

RULES & REGULATIONS:

28 C.F.R. § 540.2(c).........................................................................................53

103 MASS. CODE REGS. 481 (2022)..................................................................53

CAL. CODE REGS. tit. 15, § 3143 ...................................................................53

D.C. DEP'T OF CORR.,
*Inmate Correspondence and Incoming Publications* § 13,
Pol'y & Proc. No. 4070.4G (Apr. 22, 2024),
https://perma.cc/TP7F-CRTB ....................................................................53

FED. R. CIV. P. 56(a)........................................................................................26

Page(s)

FED. R. EVID. 902 ........................................................................................11

FLA. ADMIN. CODE ANN. r. 33-210.102(5) (2025) ...................................................53

KY. CORR.,
*Inmate Correspondence*, Pol'y & Proc. No. 16.2
(Oct. 15, 2024), https://perma.cc/RX22-5374 .................................................53

MINN. DEP'T CORR.,
*Mail*, Pol'y No. 302.020.02 (Feb. 12, 2026),
https://perma.cc/FFD6-NRUS ..............................................................53

OHIO ADMIN. CODE 5120-9-17(B)(2) (2014) ......................................................2, 9

OHIO ADMIN. CODE 5120-9-17(B)(2) (2022) ............................................. 12, 13, 49

OHIO DEP'T OF REHAB. & CORR.,
*Incarcerated Population Legal Mail*,
No. 75-MAL-03 (Sep. 23, 2025), https://perma.cc/4UCV-2TJU.......................49

**OTHER AUTHORITIES:**

MASS. DEP'T OF CORR.,
*Privileged Mail Processing Changes* (Feb. 22, 2024),
https://perma.cc/656F-BFJY ..............................................................53

OHIO DEP'T OF REHAB. & CORR.,
*Legal Mail*, https://perma.cc/M3YF-9TFW ..........................................11, 12, 49

# STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Jeremy Quinn, Jr., through his court-appointed counsel, respectfully requests oral argument. This appeal presents a fundamental First Amendment question: whether prison officials may open, read, and process legal mail from state and federal courts outside a prisoner's presence, even when the prisoner has specifically requested otherwise. Despite this Court's holding in *Sallier v. Brooks*, 343 F.3d 868, 877 (6th Cir. 2003), that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise," the District Court upheld an Ohio Department of Rehabilitation and Correction (ODRC) policy that allows exactly that.

Over Defendants Annette Chambers-Smith, Andrew Rodriguez, and Harold May's opposition, 6th Cir. Dkt. No. 6, this Court granted Quinn's motion for appointment of counsel, stating that it "believe[s] that exceptional circumstances justifying the appointment of counsel exist in this case because Plaintiff's case is non-frivolous and implicates serious constitutional rights," 6th Cir. Dkt. No. 8-1, at 1. This Court also stated that "this is a complicated case and that Plaintiff is not able to adequately represent himself in this appeal." 6th Cir. Dkt. No. 8-1, at 1. Oral argument would be helpful to flesh out the important issues in this case.

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the federal constitutional question presented in this appeal under 28 U.S.C. § 1331. That question arises under the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

This Court has jurisdiction over the appeal under 28 U.S.C § 1291. Magistrate Judge Darrell A. Clay denied Quinn's Motion for Summary Judgment, and granted in part and denied in part Defendants' Motion for Summary Judgment, on February 26, 2025. Order on Cross-Mots. for Summ. J., R.50, PageID #424-443 ("Summ. J. Order"). Judge Clay entered Final Judgment consistent with his Order on the cross-motions for summary judgment on the same day. J. Entry, R.51, PageID #444. Quinn sought reconsideration of Judge Clay's Order on the parties' cross-motions for summary judgment, which Judge Clay denied on September 29, 2025. Order on Mot. for Reconsideration, R.58, PageID #482-487. Quinn timely filed a notice of appeal on October 21, 2025. Notice of Appeal, R.59, PageID #488.

# INTRODUCTION

In 2022, ODRC formally made effective a policy that fundamentally altered the treatment of legal mail from courts in Ohio's prisons. Prior to the change, the Ohio Administrative Code defined "[l]egal mail" as "mail addressed to an inmate clearly bearing the return address of . . . [a] court of law" or other legal entities. OHIO ADMIN. CODE 5120-9-17(B)(2) (2014). In other words, and as relevant here,

2

any correspondence addressed to an incarcerated person clearly bearing the return address of a court was designated and treated as "legal mail"—meaning it was logged and could be opened and inspected, but not read, only in the presence of the prisoner it was addressed to. This policy was in line with this Court's express holding in *Sallier v. Brooks*, 343 F.3d 868, 877 (6th Cir. 2003), that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise."

After the policy change, a court's return address was no longer enough to have legitimate legal mail be treated as such. Instead, for the purported purpose of combatting contraband coming into ODRC-administered prisons through fake legal mail, the new policy necessitated a time-consuming process requiring courts and other legal entities to register with ODRC, get that registration validated by ODRC staff, and then obtain *unique* control numbers from ODRC—which expire after twenty-one days—for *every* piece of correspondence sent to prisoners in order for that mail to be treated as "legal mail." Under this new policy, mail from state and federal courts that did not bear a valid control number was "automatically treated as regular mail, regardless of the return address on the envelope"—meaning it was handled outside the prisoner's presence, not logged or tracked, and subject to certain restrictions, like a five-page limit, to which legal materials with a valid control number were not subject. Aff. of Tim Buchanan, R.44-6, PageID #297 ("Buchanan

Aff."). And, perhaps most egregiously, it allowed legal mail from the courts to be opened, read, and processed outside the prisoner's presence even when the prisoner has specifically requested otherwise, in direct contravention of this Court's express holding in *Sallier*.

Plaintiff Jeremy Quinn, Jr., then an incarcerated individual at Toledo Correctional Institution, challenged this policy and brought suit in April 2022 after his legal mail from state and federal courts was repeatedly opened, read, and processed outside his presence, despite his explicit requests to the contrary. Quinn alleged that his mail was subjected to this treatment because courts refused to comply with ODRC's arduous registration and control-number requirements—even after he reached out and asked that they do so—with court clerks at both the state and federal levels stating that the policy was too "burdensome" and "impossible" to follow given the volume of cases they handle. Compl., R.1, PageID #4 (citation modified); *accord, e.g.*, *Straughter v. Eddy*, No. 2:23-cv-1268, 2023 WL 6290069, at *5 (S.D. Ohio Sep. 27, 2023) (stating its concern with "the fact that unless the Clerk obtains a control number for every piece of mail sent to Plaintiff, Plaintiff's explicit request for mail from this Court to be treated as 'legal mail' will continue to be denied," but denying plaintiff's request to "seek this Court's compliance with the ODRC [control-number] policy" because of the "extraordinary administrative burden that

4

the new ODRC policy appears to impose on this Court and on all courts of law that send legal mail to inmates").

The District Court, on cross-motions for summary judgment, recognized what it had to: that under *Sallier*, ODRC's policy "appears to impinge on Mr. Quinn's First Amendment rights" because it "allows prison employees to open mail from state and federal courts without the inmate present if the mail does not have a control number affixed to it." Summ. J. Order, R.50, PageID #438. In the proceedings below, the court also twice denied Defendants qualified immunity—once at the motion-to-dismiss stage, and again at the motions-for-summary-judgment stage— correctly concluding that a "reasonable person would have known that opening legal mail from a court outside the inmate's presence violates the inmate's First Amendment rights." Summ. J. Order, R.50, PageID #434; *see* Mem. Op. & Order, R.23, PageID #137-138.

Yet despite these determinations, the District Court, in its Order on the cross-motions for summary judgment, nonetheless upheld the policy under its own independent application of the *Turner v. Safley*, 482 U.S. 78 (1987), balancing test, concluding that the policy withstood constitutional scrutiny. In *Turner*, the Supreme Court set out a two-part test for courts to apply to determine when a prison regulation is valid when it "impinges on inmates' constitutional rights." *Id.* at 89. First, it is the prison's burden to show that there is a "valid, rational connection between the

5

prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (citation modified). If the prison is able to meet its burden at the first step, a court moves to the second step and balances three factors together: "whether there are alternative means of exercising the right that remain open to prison inmates"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and whether there are "ready alternatives" available "that fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 90-91.

The District Court's application of *Turner*, however, was error for multiple reasons. First, this Court in *Sallier already* applied the *Turner* test to determine that "[t]here is *no* penological interest or security concern that justifies" a policy that allows "opening" legal mail "outside of the prisoner's presence when the prisoner has specifically requested otherwise." 343 F.3d at 877-878 (emphasis added); *see also id.* at 877 (citing *Turner* to conclude that "prison officials have *no* legitimate penological interest in reading" court correspondence with a prisoner (emphasis added)). The District Court may not override this Court's binding precedent through its own independent *Turner* analysis, justifying a policy that does exactly what this Court already held in *Sallier* that it cannot.

Second, even if *Turner* could be applied anew, the District Court's analysis was wrong several times over. At the first *Turner* step, there is no valid, rational

connection between the control-number policy as applied to court mail and the interest in combatting contraband. ODRC admits it has no evidence establishing either the frequency with which contraband is conveyed through purported fake court mail or the extent to which such a problem exists. *See* Dep. of Brian Wittrup, R.47, PageID #392-393 ("Wittrup Dep.") (admitting ODRC's lack of knowledge on "how often" the problem of fake court mail occurs, or "how prevalent" it is). Indeed, total reported drug-contraband incidents have actually *increased* significantly in recent years and since the policy's implementation, showing that fake legal mail—and especially fake legal mail from the courts—is not a meaningful culprit or provider of contraband.

Additionally, ODRC's own conduct belies its stated rationale: when deposed for this case, an ODRC official admitted that, after receiving multiple complaints from federal courts about the policy, ODRC *already* exempts federal courts from the policy *informally* and *in practice*. Yet Defendants continue to maintain in this case that the policy as applied to *all* courts is somehow critical to combatting contraband. Worse, Defendants have not put forward *any* persuasive reason as to why federal courts should be treated differently from state courts—an arbitrary distinction that undermines any claim of rational justification. In short, ODRC's stated rationale for the control-number policy is too remote, arbitrary, and irrational to uphold it.

The remaining *Turner* factors also counsel reversal. Prisoners have no "alternative means" of exercising their First Amendment right to have their legal mail opened and inspected, but not read, only in their presence, when courts have flatly refused to follow the policy, and prisoners cannot force courts to do so. *Turner*, 482 U.S. at 90. Accommodation of prisoners' constitutional rights would impose minimal impact on prison resources, as ODRC is *already* treating federal courts as informally exempt from the policy, so ODRC would simply have to make such an informal exemption formal and extend it to state courts. And finally, there are "obvious, easy alternatives" to the policy—namely, exempting all courts from it—that fully accommodate prisoners' rights at *de minimis* cost. *Id.* Indeed, the federal Bureau of Prisons, the District of Columbia, and virtually every state have much less onerous policies than Ohio's that do not require courts to jump through multiple hoops to have their mail treated as the legitimate legal mail it is. And of the very few states that do have similar policies, almost all exempt courts entirely from such requirements.

It is well settled that a prisoner does not forfeit his constitutional protections at the prison gate. As the Supreme Court has unequivocally stated, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-556 (1974); *see also Turner*, 482 U.S. at 84 ("Prison walls do not form a barrier separating prison inmates from the protections

of the Constitution."). "Because prisoners retain these rights, when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Turner*, 482 U.S. at 84 (citation modified) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405-406 (1974)).

This Court should now vindicate Quinn's constitutional rights by reversing the District Court's decision denying Quinn's motion for summary judgment and granting in part Defendants' cross-motion for summary judgment on his First Amendment claim.

## STATEMENT OF THE ISSUE FOR REVIEW

Whether an ODRC policy that requires courts—as a precondition for treatment as legal mail—to register with ODRC, obtain validation of that registration, secure a unique control number for each piece of correspondence sent to prisoners, and get that unique control number validated each time by ODRC staff violates the First Amendment.

## STATEMENT OF THE CASE

### A.     Factual Background

Prior to 2022, the Ohio Administrative Code defined "legal mail" as "mail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the Correctional Institution Inspection Committee." OHIO ADMIN. CODE 5120-9-17(B)(2) (2014).

That is, so long as "[m]ail addressed to an incarcerated person clearly b[ore] the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the Correctional Institution Inspection Committee (CIIC)," it was "automatically designated as 'legal mail.'" Buchanan Aff., R.44-6, PageID #295.

ODRC is the administrative department for the state of Ohio responsible for oversight of its adult prison system, along with its prisoner population. *See* OHIO REV. CODE ANN. § 121.01 *et seq.* (West 2026); *id.* § 5120.01 *et seq.* (defining ODRC's responsibilities). Legal mail received at an ODRC institution was "taken to a secured designated location, logged into the Legal Mail Log," opened (but not read) in the presence of the prisoner the mail was addressed to, and visually inspected for signs of contraband by a designated employee of ODRC. Buchanan Aff., R.44-6, PageID #295. The prisoner had to sign for the legal mail, and in addition to visual inspection by ODRC staff, "efforts to detect contraband included the use of trained ODRC K9 Units." Buchanan Aff., R.44-6, PageID #296.

By contrast, regular mail was processed outside the prisoner's presence, not logged or tracked, and subject to certain restrictions—like a five-page limit—to which legal materials were not subject. Buchanan Aff., R.44-6, PageID #295; *see* Ex. 11 to Buchanan Aff., R.44-11, PageID #334, 326-327 ("Feb. 1, 2022 Policies"). Regular mail was opened under a ventless hood system to prevent exposure to

potentially hazardous substances and visually inspected for contraband, the contents were read for potential security threats, and prisoners received copies of the contents instead of the original documents. Buchanan Aff., R.44-6, PageID #295. Like legal mail, "trained ODRC K9 Units" were also used to detect contraband. Buchanan Aff., R.44-6, PageID #296.

On October 4, 2021, a new legal-mail policy, Policy No. 75-MAL-03, was announced to prisoners. *See* Feb. 1, 2022 Policies, R.44-11, PageID #340-343; Buchanan Aff., R.44-6, PageID #296. Under the new policy, legal entities must first register with ODRC. Buchanan Aff., R.44-6, PageID #296. As part of this process, "ODRC staff validate each registration via phone and web searches to ensure that the same are only being granted to licensed, practicing attorneys, law firms, legal clinics, or a court of law." Buchanan Aff., R.44-6, PageID #296. Among other things, this registration process involves ODRC staff "contact[ing]" the "phone number submitted in the registration application" to validate registration applications. OHIO DEP'T OF REHAB. & CORR., *Legal Mail*, https://perma.cc/M3YF-9TFW; *see* Buchanan Aff., R.44-6, PageID #296 (citing *Legal Mail*, *supra*).[1]

---

[1] In addition to the fact that Defendants cite *Legal Mail*, *supra*, in the record as where to find "[t]he process to obtain a control number," Buchanan Aff., R.44-6, PageID #296, information taken from government websites is self-authenticating under Federal Rule of Evidence 902, and courts may accordingly take judicial notice of the information found on these websites. *See, e.g.*, *Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009) (taking judicial notice of the information on a government website).

Once registered and verified with ODRC, legal entities are given access to an online portal where they can generate unique control numbers. *Legal Mail*, *supra*; *see* Buchanan Aff., R.44-6, PageID #296 (citing *Legal Mail*, *supra*). Legal entities are required to generate a new, unique control number each time they send a piece of legal mail, and to affix that unique control number to the envelope of each piece of legal mail sent to a prisoner in order for ODRC to process it as legal mail. *See Legal Mail*, *supra*; Buchanan Aff., R.44-6, PageID #296. Control numbers expire after twenty-one days, and ODRC staff must screen legal mail each time to determine whether a valid, unexpired control number exists. *See* Feb. 1, 2022 Policies, R.44-11, PageID #340-343; *Straughter v. Eddy*, No. 2:23-cv-1268, 2023 WL 6290069, at *2-3 (S.D. Ohio Sep. 27, 2023); Login Instructions, Dkt. No. 36-11, *Brown v. Chambers-Smith*, No. 2:22-cv-2469 (S.D. Ohio Dec. 6, 2022).

Similar to the old policy, legal mail containing a valid control number is logged and can be opened (but not read) and inspected for contraband only in the prisoner's presence. Buchanan Aff., R.44-6, PageID #296. But the similarity ends there. Mail not containing a valid control number is "automatically treated as regular mail, regardless of the return address on the envelope." Buchanan Aff., R.44-6, PageID #297. In 2022, the definition of "legal mail" in the Ohio Administrative Code was revised to be consistent with this policy change:

> "Legal mail" is mail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school

12

legal clinic, court of law, or the correctional institution inspection committee that is marked with a valid control number provided by the department. It may be opened and inspected for contraband only in the presence of the inmate-addressee. "Legal mail" does not include postcards from a court of law that indicates fees and/or fines owed by the inmate-addressee. If mail is received from any of the groups listed without a valid control number, then it may be treated as a regular, non-legal mail[.]

OHIO ADMIN. CODE 5120-9-17(B)(2) (2022).

The policy change recharacterized what appears to be legitimate legal mail as regular mail for want of an administrative control number. Buchanan Aff., R.44-6, PageID #296-297. The stated reason for the change in policy requiring courts and other legal entities to register with ODRC, and to then obtain and affix a unique control number to each piece of legal mail sent to a prisoner at an ODRC-administered institution, was to combat the conveyance of contraband into the facility via fake legal mail. *See* Buchanan Aff., R.44-6, PageID #296.[2]

---

[2] It is unclear exactly when the policy change went into effect. Policy No. 75-MAL-03 and the revision of § 5120-9-17(B)(2) of the Ohio Administrative Code were formally made effective in early 2022, but the new policy "appears to have been in place or enforced for several months before that." *King v. Aramark Corr. Servs.*, No. 2:23-cv-156, 2024 WL 3461784, at *2 (S.D. Ohio Mar. 22, 2024) (citation modified). Indeed, Defendants' Motion for Summary Judgment below represents that the policy was "implemented" on "October 4, 2021." Defs.' Mot. for Summ. J., R.44, PageID #251. *But see* Mot. to Have Clerk of Court Seek a "Control Number", Dkt. No. 14, *id.*, at 5 (S.D. Ohio July 26, 2023) (undated letter on ODRC letterhead noting that "[s]ince July 1, 2021, all ODRC institutions have been processing Legal Mail bearing a legitimate control number on the envelope of each piece of Legal Mail").

According to Defendants, "[t]he process of registering, being verified, and obtaining control numbers for each piece of legal mail [has] significantly decreased the overall amount of legal mail coming into [ODRC] institutions"; indeed, Defendants have even described the decrease in legal mail after the implementation of the new policy as "sharp." Aff. of Vinko Kucinic, R.44-1, PageID #271 ("Kucinic Aff."); *see* Ex. 2 to Kucinic Aff., R.44-3, PageID #291 ("Legal Mail Graph") (graph showing that total legal mail coming into ODRC institutions dropped precipitously immediately after the implementation of the control-number policy, and has only decreased further since). And because the policy has significantly decreased the overall amount of legal mail coming into ODRC-administered institutions, ODRC asserts that contraband intercepted through legal mail has also dropped. Kucinic Aff., R.44-1, PageID #272.

### B. Procedural History

**1.** After exhausting the prison grievance process, Plaintiff Jeremy Quinn, Jr., proceeding *pro se*, filed this 42 U.S.C. § 1983 action on April 25, 2022. Compl., R.1, PageID #1-10; *see* Exs. A-1 to B-3 to Compl., R.1-4 to 1-8, PageID #22-26. Quinn—then a prisoner at Toledo Correctional Institution, a state prison owned and operated by ODRC—alleged that because of the new policy, state and federal courts were sending mail related to his ongoing cases that was being opened, read, and processed outside his presence, even when Quinn specifically requested that such

mail only be inspected (but not read) in his presence.  Compl., R.1, PageID #3-7.

He further alleged that he contacted the state and federal courts while this was going

on in an attempt to have them follow the control-number policy, but court clerks at

both the state and federal level said they were not following it because of how

"burdensome" and "impossible" it was to do so due to the volume of criminal and

civil cases they handle.  Compl., R.1, PageID #4 (citation modified).  Quinn argued

that ODRC's policy violates his First Amendment right to receive legal mail, and

sought damages, declaratory relief, and injunctive relief.  Compl., R.1, PageID #7-

9.[3]

**2.** On July 7, 2022, Defendants moved to dismiss Quinn's complaint for

failure to state a claim.  Mot. to Dismiss, R.8, PageID #57-65.  On Quinn's motion,

the District Court appointed counsel to represent Quinn, Order, R.18, PageID #111,

and ordered supplemental briefing on the motion to dismiss, Order, R.20, PageID

#114.  The District Court then granted in part and denied in part Defendants' motion

to dismiss.  J. Entry, R.24, PageID #140.  As relevant here, the District Court allowed

---

[3] Quinn originally named as Defendants John/Jane Doe (mailroom supervisor and correctional officer), John/Jane Doe (Main Central Office of ODRC administrative staff who created and enforced the Legal Mail Policy), and Toledo Correctional Institution Warden Harold May.  Compl., R.1, PageID #2.  The District Court later granted Quinn's motion to amend the complaint to substitute Andrew Rodriguez in place of John/Jane Doe (mailroom supervisor and correctional officer), J. Entry, R.24, PageID #140, and Quinn's motion to add Annette Chambers-Smith, ODRC's Director, as a Defendant, Order on Pl.'s Mot. for Joinder of Third Party, R.33, PageID #190-191.

15

the First Amendment claim to proceed, concluding that "Defendants have not met their burden to establish they are entitled to qualified immunity at this stage, or to show Quinn has failed to state a plausible claim for relief." Mem. Op. & Order, R.23, PageID #137. The court determined that Defendants were not entitled to qualified immunity because of this Court's express holding in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003), that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner *who has specifically requested otherwise.*" Mem. Op. & Order, R.23, PageID #138 (quoting *Sallier*, 343 F.3d at 877). The District Court further determined that "the facts contained in the record show Defendants' application of the Policy categorically excludes a specific and protected form of communication and disregarded Quinn's explicit request to have his legal mail opened only in his presence." Mem. Op. & Order, R.23, PageID #138.

**3.** In April 2024, when deposed for this case, Brian Wittrup, the chief of strategy and policy at ODRC, testified that although the formal policy on legal mail has not been amended, directives have been given to ODRC prisons and their leadership to exempt federal-court mail from the control-number policy. Wittrup Dep., R.47, PageID #398-400. This step was taken after federal courts complained about the procedure, though the precise date is uncertain. Wittrup Dep., R.47, PageID #397-398. But because there has not been a formal change in the policy, and only informal "directives have been given," Wittrup stated that "[i]t is up to 28

16

separate prisons and their leadership to enforce [this exemption] and know whether or not [this exemption] [is] being followed." Wittrup Dep., R.47, PageID #400. Wittrup testified that "[t]here's just no way for [him] to know . . . if [the exemption] is being adhered to." Wittrup Dep., R.47, PageID #400.

**4.** In May 2024, the parties filed cross-motions for summary judgment.[4] Pl.'s Mot. for Summ. J., R.43, PageID #237-245; Defs.' Mot. for Summ. J., R.44, PageID #246-268. The District Court denied Quinn's motion, and granted in part and denied in part Defendants' motion. Summ. J. Order, R.50, PageID #443. As relevant here, the court first held that Defendants were not entitled to qualified immunity on Quinn's First Amendment claim for the same reason it denied qualified immunity at the motion-to-dismiss stage: "the Policy at issue does not square with the Sixth Circuit's express holding in *Sallier*" that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise." Summ. J. Order, R.50, PageID #434 (quoting *Sallier*, 343 F.3d at 877). The court stated that a "reasonable person would have known that opening legal mail from a court outside the inmate's presence"—as this policy

---

[4] Judge Jeffrey J. Helmick originally presided over this case. *See* Summ. J. Order, R.50, PageID #424-425. Starting in August 2023 and at the parties' consent, the case was heard before a magistrate judge. *See* Rule 26(f) Report, R.26, PageID #147-150; Non-Document Order (Aug. 23, 2023). Magistrate Judge Darrell A. Clay therefore presided over the cross-motions for summary judgment and all subsequent motions. *See* Non-Document Order (Aug. 23, 2023).

allows when legitimate legal mail does not contain a valid control number—"violates the inmate's First Amendment rights."  Summ. J. Order, R.50, PageID #434.

Moving from the issue of qualified immunity to whether the policy violates Quinn's First Amendment right to receive mail from the courts, the District Court concluded that ODRC's policy appears "to impinge on Mr. Quinn's First Amendment rights" under *Sallier* because it "allows prison employees to open mail from state and federal courts without the inmate present if the mail does not have a control number affixed to it."  Summ. J. Order, R.50, PageID #438.  But despite this conclusion, the District Court nonetheless held that the policy withstood constitutional scrutiny anyway under the Supreme Court's multi-factor test in *Turner v. Safley*, 482 U.S. 78 (1987), for evaluating whether a prison regulation is valid when it impinges on prisoners' constitutional rights.  Summ. J. Order, R.50, PageID #442-443.

**5.** Representing himself following the discharge of Quinn's court-appointed counsel, Quinn sought reconsideration of the District Court's Order on the cross-motions for summary judgment, which the District Court denied on September 29, 2025.  Order on Mot. for Reconsideration, R.58, PageID #482-487.  Quinn timely appealed to this Court and sought appointment of counsel for his appeal, which Defendants opposed.  Notice of Appeal, R.59, PageID #488; 6th Cir. Dkt. Nos. 5, 6.

Despite Defendants' opposition, this Court granted Quinn's motion for appointment of counsel, stating that it "believe[d] that exceptional circumstances justifying the appointment of counsel exist in this case because Plaintiff's case is non-frivolous and implicates serious constitutional rights." 6th Cir. Dkt. No. 8-1, at 1. This Court also stated that it believed that "this is a complicated case and that Plaintiff is not able to adequately represent himself in this appeal." 6th Cir. Dkt. No. 8-1, at 1.

## SUMMARY OF ARGUMENT

**I.** The Constitution, and its protections, do not stop at the prison gate. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (collecting cases). "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-556 (1974).

This Court has expressly recognized this principle in the legal-mail context, long ago holding in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003), that, "[i]n order to guard against the possibility of a chilling effect on a prisoner's exercise of his or her First Amendment rights and to protect the right of access to the courts," "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise." *Id.* at 877.

This holding, the Court stated, reflects the "heightened concern" with allowing prison officials and employees "unfettered discretion to open and read" prisoners' mail: "a prison's security needs do not automatically trump a prisoner's

First Amendment right to receive mail, especially correspondence that impacts upon or has import for the prisoner's legal rights, the attorney-client privilege, or the right of access to the courts." *Id.* at 874; *see also, e.g.*, *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996) (describing a prisoner's right to protect the contents of correspondence with legal entities as a "basic" and "fundamental right"). In fact, this Court has even "implied" in multiple cases that "a prison policy allowing inmates to be present when" legal mail is "opened [is] constitutionally required" "because of the potentially confidential nature of such correspondence." *Sallier*, 434 F.3d at 877 (citing *Muhammad v. Pitcher*, 35 F.3d 1081, 1083 (6th Cir. 1994)).

**II.** The District Court erred by applying the *Turner v. Safley*, 482 U.S. 78 (1987), balancing test to override this Court's binding holding in *Sallier*. Although the District Court correctly recognized that ODRC's control-number policy "appears to impinge on Mr. Quinn's First Amendment rights" under *Sallier,* it nonetheless upheld the policy under its own application of the *Turner* balancing test. Summ. J. Order, R.50, PageID #438.

In *Turner*, the Supreme Court stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. To determine whether a prison regulation which impinges on prisoners' constitutional rights is valid, the Court set out a two-part test for courts to apply. First, it is the prison's burden to show that

there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (citation modified). The logical connection between the regulation and the objective cannot be "so remote as to render the policy arbitrary or irrational," and the objective must be "legitimate and neutral." *Id.* at 89-90.

Only if the prison is able to meet its burden at the first step does a court move to the second step and balance three factors together: "whether there are alternative means of exercising the right that remain open to prison inmates"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and whether there are "ready alternatives" available "that fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 90-91. And while "courts generally defer" at this step "to the expertise of prison officials 'in the adoption and execution of polic[i]es and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,'" *Flagner v. Wilkinson*, 241 F.3d 475, 487 (6th Cir. 2001) (quoting *Wolfish*, 441 U.S. at 547), this Court "afford[s] no deference to the policies and judgments of prison officials if there is 'substantial evidence in the record to indicate that the officials have exaggerated their response,'" *id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

**A.** The District Court's application of *Turner* is wrong in the first instance. The District Court recognized that "ODRC's Policy allows prison employees to open mail from state and federal courts without the inmate present if the mail does not have a control number affixed to it." Summ. J. Order, R.50, PageID #438. It also at least purported to recognize *Sallier*'s holding that legal mail from the courts *must* be inspected for contraband *only* "in the presence of the recipient, if such a request has been made by the prisoner," and such inspection cannot include reading such mail. 343 F.3d at 874. But it nevertheless determined that it was not bound by *Sallier* under its own application of the *Turner* balancing test.

However, the District Court failed to recognize that this Court in *Sallier* *already* applied the *Turner* balancing test there to determine that "[t]here is *no* penological interest or security concern that justifies opening" legal mail "outside of the prisoner's presence when the prisoner has specifically requested otherwise." *Id.* at 877-878 (emphasis added); *see also id.* at 877 (citing *Turner* to conclude that "prison officials have no legitimate penological interest in reading" court correspondence with a prisoner). The District Court may not override this Court's binding precedent in *Sallier*—which, again, *already* applied the *Turner* test to conclude that there is "*no penological interest*" in a policy that justifies opening legal mail "outside of the prisoner's presence when the prisoner has specifically requested

22

otherwise"—through its own independent *Turner* analysis. *Id.* at 877-878 (emphasis added).

**III.** Even if *Turner* could be applied anew, the District Court's analysis was flawed at every step.

**A.** At the first *Turner* step, there is no valid, rational connection between the control-number policy as applied to court mail and the interest in combatting contraband. ODRC admitted that it has *no* evidence of "how often" contraband is conveyed through fake court mail as opposed to fake mail from attorneys or other legal entities, or even how "prevalent" such an issue even is. Wittrup Dep., R.47, PageID #392-393. Moreover, total reported drug-contraband incidents have risen sharply in recent years and since the policy's implementation—casting serious doubt on the notion that fake legal mail, much less fake court mail, is a meaningful conduit for contraband. These facts severely undermine Defendants' stated rationale for the policy and show that the application of the control-number requirement to court mail is an "exaggerated response" to the stated interest in combatting contraband through fake legal mail that "sweeps much more broadly than can be explained by [ODRC's] penological objectives." *Turner*, 482 U.S. at 98.

Additionally, and possibly most critically, the logical connection between the regulation and the objective is "so remote as to render the policy arbitrary or irrational." *Id.* at 89-90. This Court has stated in no uncertain terms that "disregard

23

for established regulations relating to the delivery of legal mail give[s] rise to an inference of arbitrary or capricious action." *ACLU Fund of Mich. v. Livingston County*, 796 F.3d 636, 646 (6th Cir. 2015) (citation modified) (quoting *Lavado v. Keohane*, 992 F.2d 601, 610 (6th Cir. 1993)). But that is exactly what Defendants are doing here: ODRC *already informally* exempts federal courts from the control-number policy. But whether this exemption is being followed is left "up to 28 separate prisons and their leadership." Wittrup Dep., R.47, PageID #400.

This disregard for ODRC's *own established policy* of applying the control-number requirement to all courts—as well as the unpredictability with which each ODRC-administered prison is following such an informal exemption—"give[s] rise to an inference of arbitrary or capricious action" that defeats the claimed rational connection. *Id.* And Defendants have put forward *no* persuasive reason to treat federal courts, but not state courts, as exempt from the policy. Defendants' inconsistent litigating positions in various legal-mail lawsuits in this circuit—maintaining the policy is necessary here while stipulating to exempt federal courts from the policy in other cases like *Allah v. Chambers-Smith*—further demonstrates the policy's arbitrariness. *See* Stipulated Order Regarding Legal Mail from Fed. Cts., Dkt. No. 91, No. 2:22-cv-21-EAS-KAJ, at 6 (S.D. Ohio June 25, 2024).

**B.** Though this Court need not reach them, the remaining *Turner* factors also counsel reversal. For starters, there are no "alternative means of exercising the right

that remain open to prison inmates," *Turner*, 482 U.S. at 90, as prisoners have *no* way to force courts to follow the control-number policy, and both federal and state courts have indeed declared that they will *not* comply with the policy—despite being asked by prisoners to do so—due to, *inter alia*, the "extraordinary administrative burden" the policy imposes "on all courts of law that send legal mail to inmates," *Straughter v. Eddy*, No. 2:23-cv-1268, 2023 WL 6290069, at *5 (S.D. Ohio Sep. 27, 2023). This state of play means that legitimate legal mail from the courts will be— and indeed is—opened, read, and processed outside prisoners' presence against their wishes, and without prisoners being able to do anything to prevent such unconstitutional actions.

Moreover, there will be minimal "impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," because ODRC is *already informally* exempting federal courts from its established policy. *Turner*, 482 U.S. at 90. ODRC would just have to ensure that such an *informal* policy is routinely being followed *formally* and in *all* prisons it administers, and apply such an exemption to state courts as well. Such an accommodation is minimal.

Finally, the policy is an "exaggerated response" to prison concerns because there are "obvious, easy alternatives" to it "that fully accommodate[ ]" prisoners' rights at "*de minimis* cost to" any purported penological interest: nearly every other

state, the District of Columbia, and the federal Bureau of Prisons do not impose arduous control-number-like requirements for legal mail, and of the very few states with similar policies, the vast majority exempt all courts. *Id.* at 90-91. ODRC could take a similar tack and, at *de minimis* cost, simply exempt all courts from its policy, which is, again, what it is *already* doing informally for federal courts.

## STANDARD OF REVIEW

This Court reviews a district court's summary-judgment rulings de novo and draws all inferences in favor of the party against whom summary judgment was entered. *See Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir. 2013); *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment should not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

The fact that the parties have filed cross-motions for summary judgment does not alter these general standards. *See Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrecoverable Tr.*, 410 F.3d 304, 309 (6th Cir. 2005). Rather,

this Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## ARGUMENT

The District Court's decision denying Quinn's motion for summary judgment on his First Amendment claim, and granting in part Defendants' cross-motion for summary judgment on that same claim, is wrong for multiple reasons, each of which compels reversal.

**I.**     **A Prisoner Does Not Forfeit His Constitutional Protections At The Prison Gate, And This Court Has Recognized As Much In The Legal-Mail Context.**

A prisoner does not forfeit all constitutional protections at the prison gate. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  In line with this longstanding and well-established principle, prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments, *see Pell v. Procunier*, 417 U.S. 817 (1974); *Cruz v. Beto*, 405 U.S. 319 (1972); *Cooper v. Pate*, 378 U.S. 546 (1964), are protected against invidious discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment, *see Lee v. Washington*, 390 U.S. 333 (1968), retain the right to petition the government for the redress of grievances, *see Johnson v. Avery*, 393 U.S. 483 (1969), and may claim the protection of the Due Process

Clause to prevent additional deprivation of life, liberty, or property without due process of law, *see Meachum v. Fano*, 427 U.S. 215 (1976); *Wolff v. McDonnell*, 418 U.S. 539 (1974).

This Court has recognized as much in the legal-mail context. When incoming mail is "legal mail," there is a "heightened concern" with allowing prison officials or employees "unfettered discretion to open and read" prisoners' mail "because a prison's security needs do not automatically trump a prisoner's First Amendment right to receive mail, especially correspondence that impacts upon or has import for the prisoner's legal rights, the attorney-client privilege, or the right of access to the courts." *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003); *see also, e.g.*, *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996) ("The right of a prisoner to receive materials of a legal nature, which have impact upon or import with respect to that prisoner's legal rights and/or matters, is a basic right recognized and afforded protection by the courts[.]"); *Kensu*, 87 F.3d at 174 (referring to a prisoner's right to protect the contents of correspondence with legal entities as a "fundamental right").

In *Sallier*, this Court declared that "[i]n order to guard against the possibility of a chilling effect on a prisoner's exercise of his or her First Amendment rights and to protect the right of access to the courts," it was "hold[ing] that mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise." 434 F.3d at 877; *accord, e.g.*, *Muhammad v.*

28

*Pitcher*, 35 F.3d 1081, 1083-84 (6th Cir. 1994) (holding that a prisoner's "reasonable expectation" that his legal mail will be "opened outside of his presence" unconstitutionally "chill[s]" prisoners from corresponding with entities "intimately related to the administration of justice" (quoting *Stover v. Carlson*, 413 F. Supp. 718, 723 (D. Conn. 1976))).  In fact, this Court has even "implied" in multiple cases that "a prison policy allowing inmates to be present when" legal mail is "opened [is] constitutionally required" "because of the potentially confidential nature of such correspondence."  *Sallier*, 434 F.3d at 877 (citing *Muhammad*, 35 F.3d at 1083).

## II.    The District Court's Application of *Turner* To Overturn *Sallier*'s Holding Is Wrong In The First Instance.

The District Court here recognized—as it had to—that under *Sallier*, "mail from a court is legal mail and cannot be opened outside the presence of a prisoner who has specifically requested otherwise."  Summ. J. Order, R.50, PageID #438. The court continued, "Because ODRC's Policy allows prison employees to open mail from state and federal courts without the inmate present if the mail does not have a control number affixed to it, the Policy appears to impinge on Mr. Quinn's First Amendment rights."  Summ. J. Order, R.50, PageID #438.

But despite purporting to recognize *Sallier*'s holding, the District Court wrongly went on to hold that the policy withstood constitutional scrutiny anyway under the Supreme Court's multi-factor test in *Turner v. Safley*, 482 U.S. 78 (1987),

for evaluating whether a prison regulation is valid when it impinges on prisoners' constitutional rights. Summ. J. Order, R.50, PageID #442-443.

In *Turner*, the Supreme Court stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. To determine whether a prison regulation which impinges on prisoners' constitutional rights is valid, the Court set out a two-part test for courts to apply.

First, it is the prison's burden to show that there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," and no deference is given to the judgment of corrections authorities at this step. *Id.* (citation modified); *see Figel v. Overton*, 121 F. App'x 642, 646 n.2 (6th Cir. 2005) (stating that it is the prison's burden to "articulate [its] interest in the regulation" because "[o]therwise, a prisoner would be forced to hypothesize any number of potential legitimate penological interests and then disprove a reasonable relationship between each and the regulation at issue" (citing *Turner*, 482 U.S. at 89)); *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986) ("[T]he burden remains upon the prison officials to put forth legitimate reasons for interfering with a prisoner's incoming mail."); *McElhaney v. Elo*, 202 F.3d 269, 269 (6th Cir. 2000) (Table).

30

The logical connection between the regulation and the objective cannot be "so remote as to render the policy arbitrary or irrational," and the objective must be "legitimate and neutral." *Turner*, 482 U.S. at 89-90. Moreover, at this step, "prison officials are required to go beyond broad assertions that" the constitutionally protected activity "poses a risk or inconvenience." *Elo*, 202 F.3d at 269. Prison officials must "show more than a formalistic logical connection between a regulation and a penological objective," *Beard v. Banks*, 548 U.S. 535 (2006), as "[t]he Constitution requires that considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit meaningful constitutional review," *Elo*, 202 F.3d at 269 (quoting *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1989)); *cf. Cleavinger v. Saxner*, 474 U.S. 193, 207 (1985) ("Routine and automatic arguments" that "every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional . . . security" "have been rejected by this Court." (collecting cases)).

If the first *Turner* factor is not met, "the regulation is unconstitutional, and the other factors do not matter." *Hanrahan v. Mohr*, 905 F.3d 947, 954 (6th Cir. 2018) (quoting *Muhammad*, 35 F.3d at 1084). But if the prison *is* able to meet its burden at the first step, the Court moves to the second step and balances three factors together: "whether there are alternative means of exercising the right that remain open to prison inmates"; "the impact accommodation of the asserted constitutional

31

right will have on guards and other inmates, and on the allocation of prison resources generally"; and whether there are "ready alternatives" available "that fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 90-91.

Although these three factors should be "balanced together" as "guidelines for the [C]ourt to assess whether the prison officials' actions are reasonably related to a valid penological basis," they need not be "weighed evenly." *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001). And while "courts generally defer" at this step "to the expertise of prison officials 'in the adoption and execution of polic[i]es and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,' " *id.* at 487 (quoting *Wolfish*, 441 U.S. at 547), this Court "afford[s] no deference to the policies and judgments of prison officials if there is 'substantial evidence in the record to indicate that the officials have exaggerated their response,' " *id.* (quoting *Pell*, 417 U.S. at 827).

A. **The District Court Wrongly Upheld The Control-Number Policy Under *Turner*'s Multi-Factor Test, Despite This Court's Holding In *Sallier* That Court Mail Cannot Be Opened And Read Outside The Presence Of A Prisoner Who Has Requested Otherwise.**

The District Court here held that the control-number policy withstood constitutional scrutiny under the *Turner* test by noting, among other things, that the policy has significantly decreased the overall amount of legal mail coming into ODRC-administered institutions and therefore the volume of contraband entering

facilities through legal mail, that "the Policy itself presents prisoners with alternative means to have mail from courts opened in their presence simply by requesting that courts obtain and affix control numbers to legal mail sent to inmates," that the policy has "led to the elimination of hundreds of invalid registrations for attorneys and law firms," and that "a return to the old system cannot be achieved at a *de minimis* cost to valid penological interests." Summ. J. Order, R.50, PageID #439-442.

But the District Court's application of *Turner* is wrong in the first instance. The District Court purported to recognize this Court's holding in *Sallier* that legal mail from the courts *must* be inspected for contraband *only* "in the presence of the recipient, if such a request has been made by the prisoner," and such inspection cannot include reading such mail. *Sallier*, 343 F.3d at 874; *see* Summ. J. Order, R.50, PageID #438. But it nonetheless determined that it was not bound by *Sallier* under its own application of the *Turner* balancing test.

The District Court failed to recognize, however, that in *Sallier*, this Court *already* applied the *Turner* balancing test to the prison's mail policy at issue there, which—like the policy at issue here—allowed prison employees to open court mail outside a prisoner's presence even after the prisoner requested to have such mail opened only in his presence. *See id.* at 872, 876. In doing so, this Court determined that, under the *Turner* balancing test itself, "[t]here is *no* penological interest or security concern that justifies opening" legal mail "outside of the prisoner's presence

33

when the prisoner has specifically requested otherwise." *Id.* at 877-878 (emphasis added); *see also id.* at 877 (citing *Turner* to conclude that "prison officials have no legitimate penological interest in reading" court correspondence with a prisoner). This Court emphasized that in "*balanc[ing]* the interest of prison security against the possibility of tampering that could unjustifiably chill the prisoner's right of access to the courts or impair the right to be represented by counsel," "constitutionally protected [legal] mail can be opened (although not read) and inspected for contraband. The only requirement is that such activity must take place in the presence of the recipient, if such a request has been made by the prisoner." *Id.* at 874 (emphasis added).

The District Court may not override this Court's binding holding in *Sallier*— which *already* applied the *Turner* test to conclude that there is "*no penological interest*" in a policy that justifies opening legal mail "outside of the prisoner's presence when the prisoner has specifically requested otherwise"—through its *own* application of the *Turner* test. *Id.* at 877-878 (emphasis added). The District Court's *Turner* analysis justifies a policy that does just what this Court held in *Sallier* that a policy cannot: allow prison employees to open and read legal mail outside the prisoner's presence even when he has requested otherwise. *Id.* at 876-877.

34

**III.  The District Court's *Turner* Analysis Is Wrong.**

Even if the Court disagrees with the foregoing and believes that the *Turner* test could be applied here, the District Court's decision was wrong in multiple, independent respects.

**A.  There Is No Valid, Rational Connection Between The Control-Number Policy And The Interest In Combatting The Conveyance Of Contraband.**

At the first *Turner* step, there is no rational connection between the control-number policy and the governmental interest put forward to justify it—the prevention of contraband from entering ODRC-administered prisons.

**1.** In his deposition, Wittrup confirmed that ODRC has no evidence on "how often" contraband is conveyed through fake legal mail *from courts*, or even "how prevalent" that problem is, despite what may be said about fake legal mail from *attorneys* and other legal organizations.  Wittrup Dep., R.47, PageID #392-393.  This shows that the application of the control-number requirement to court mail is an "exaggerated response" to the objective of combatting contraband that "sweeps much more broadly than can be explained by [ODRC's] penological objectives." *Turner*, 482 U.S. at 93, 98; *see Flagner*, 241 F.3d at 487 ("[W]e afford no deference to the policies and judgments of prison officials if . . . 'officials have exaggerated their response.'" (quoting *Pell*, 417 U.S. at 827)).

Despite the lack of evidence as to "how often" the problem of fake legal mail from courts occurs, or "how prevalent" the issue is, Wittrup explained that courts were not exempted from the policy because "the wider you make exceptions to a policy the more trucks can drive through it." Wittrup Dep., R.47, PageID #392-393, 407. But the District Court and Defendants cannot point to evidence demonstrating the problem of conveyance of contraband into ODRC-administered institutions through fake legal mail from *non*-court entities to support a policy that applies to *court* mail.

Indeed, the Supreme Court in *Turner* rejected such a prophylactic approach when analyzing whether a prison policy that prohibits prisoners from marrying unless the prison superintendent has approved the marriage passed constitutional muster. *See* 482 U.S. at 98. The Court stated that the marriage ban did not because "[t]he rehabilitation concern appears from the record to have been centered almost exclusively on female inmates marrying other inmates or ex-felons; it does not account for the ban on inmate-civilian marriages" or "the marriage of male inmates." *Id.* at 98-99. The marriage ban thus swept more "broadly than c[ould] be explained by [the prison officials'] penological objectives" and "represent[ed] an exaggerated response to such security objectives." *Id.* at 97-98. So too here with the application of the control-number policy to court mail, when Defendants' main concern appears to be centered on fake legal mail from attorneys and other legal entities.

36

**2.** Moreover, evidence in the record shows that total reported drug-contraband incidents have actually gone *up* significantly in recent years, despite the control-number policy having been in place since 2021 or 2022 for the purported purpose of combatting contraband. *See* Ex. 3 to Aff. of Vinko Kucinic, R.44-4, PageID #292 ("Contraband Incidents Graph") (showing that total reported drug-contraband incidents went up from 7,046 in 2022 to 8,208 in 2023); *see also* Hum. Rts. Def. Ctr. et al. Br. 24 n.14 (stating that total reported drug-contraband incidents in ODRC-administered institutions reached a four-year high in 2024, at 12,463 reported incidents). This evidence suggests that legal mail from the courts is not a meaningful culprit or provider of contraband, meaning Defendants' stated rationale for the control-number policy is too "remote," "arbitrary," and "irrational" to uphold it. *Turner*, 482 U.S. at 89-90.

And although the District Court upheld the control-number policy in part because "the process of registering, being verified, and obtaining control numbers for each piece of legal mail significantly decreased the overall amount of legal mail coming into institutions" and therefore "decreased the volume of contraband" that enters ODRC-administered facilities "through legal mail," Summ. J. Order, R.50, PageID #439 (quoting Kucinic Aff., R.44-1, PageID #271), the fact that a decline in legal-mail contraband tracks a corresponding collapse in legal-mail volume after the control-number policy was made effective simply suggests—particularly when the

facts are read in the light most favorable to Quinn, as they must on a motion for summary judgment, *see supra* pp. 26-27—that the policy just shifted contraband incidents from legal-mail channels to regular-mail channels, rather than decreasing the overall amount of contraband incidents (which it has not, *see supra* p. 37).

Relatedly, it is implausible to suggest—as Defendants did below—that the "sharp" decrease in legal mail after implementation of the new policy can simply be attributed to weeding out all fake legal mail. Kucinic Aff., R.44-1, PageID #271. Indeed, Defendants' data shows that after the implementation of the policy, total incoming legal mail per month coming into ODRC-administered prisons ranged from around 2,500 pieces to 5,500 pieces. *See* Legal Mail Graph, R.44-3, PageID #291. But *prior* to the policy, total incoming legal mail per month usually stayed in the range of around *10,500 to 12,500*. *See* Legal Mail Graph, R.44-3, PageID #291. Especially when read in the light most favorable to Quinn, that huge delta of *7,000-8,000* pieces of legal mail per month is more likely the result of *legitimate legal mail* now being processed as regular mail than it is of weeding out thousands of pieces of fake court mail (for which, again, Defendants have *no specific data*). *See* Legal Mail Graph, R.44-3, PageID #291; Wittrup Dep., R.47, PageID #392-393.

**3.** Finally, and maybe most importantly, the logical connection between the regulation and the objective of combatting contraband is "so remote as to render the policy arbitrary or irrational," *Turner*, 482 U.S. at 89-90, because, as Wittrup

38

confirmed in his deposition testimony, ODRC *already* informally treats federal courts as exempt from the control-number policy, but whether or not such an exemption is "being followed" is "up to 28 separate prisons and their leadership." Wittrup Dep., R.47, PageID #400.

This Court has point-blank stated that "disregard for established regulations relating to the delivery of legal mail give[s] rise to an inference of arbitrary or capricious action." *ACLU Fund of Mich. v. Livingston County*, 796 F.3d 636, 646 (6th Cir. 2015) (citation modified) (quoting *Lavado v. Keohane*, 992 F.2d 601, 610 (6th Cir. 1993)). And prison officials violate a prisoner's First Amendment rights when they open and read incoming mail in an arbitrary and capricious fashion. *See Parrish*, 800 F.2d at 604.

Defendants' disregard for their own established policy requiring *all* courts to obtain control numbers—as well as the unpredictability with which each prison is following such an informal exemption—"give[s] rise to an inference of arbitrary or capricious action" that undermines Defendants' stated rationale for the control-number policy and shows that there is no logical connection between the regulation and the stated objective of preventing contraband. *Livingston County*, 796 F.3d at 646 (citation modified); *cf. Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992) (upholding a district court's order requiring "implementation of a *uniform* policy at all facilities, with inmates being asked at intake whether they wish to invoke their

privilege of being present at the opening of legal mail," when the prison system's established policy at issue there reflected as much, but "[i]n practice, the policy varie[d] from institution to institution," permitting "needless infringement of the inmates' right to confidentiality in their communications with counsel" (emphasis added)).

And Defendants have furthermore put forward *no* persuasive reason to treat federal courts, but not state courts, as exempt from the policy, further demonstrating how "arbitrary" and "irrational" it is. *Turner*, 482 U.S. at 90. In fact, Defendants never *once* stated *any* reason in their briefing before the District Court as to why state courts might need to follow the control-number policy, but federal courts would not; Defendants at no time even addressed the fact that federal courts are now informally exempt from the policy. *See, e.g.*, Defs.' Mot. for Summ. J., R.44, PageID #253 (stating, without differentiating between types of courts, their determination that not including *all* "courts with the same requirements as other legal mail would circumvent the purpose of the new policy").[5] Indeed, Quinn is aware of *no* legal-mail policy *anywhere* in the nation that treats federal courts and state courts

---

[5] To the extent Defendants attempt to proffer new justifications on appeal for their policy decisions, "explanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations. Only the true explanations for the policy count." *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014).

differently. And for good reason: it is unclear what convincing justification there would be to require the latter to jump through more hoops for their legal mail to be treated as legal mail than the former.

Even worse, Defendants have taken inconsistent litigating positions in various legal-mail lawsuits *in this very circuit* as to whether they have a "legitimate governmental interest" that justifies their control-number policy as it applies to courts. *Id.* at 89. In this case, Defendants have consistently maintained their position that the control-number policy as applied to courts is necessary to prevent the conveyance of contraband through fake legal mail. *See, e.g.*, Defs.' Mot. for Summ. J., R.44, PageID #253 ("ODRC determined that not including the courts with the same requirements as other legal mail would circumvent the purpose of the new policy.").

But, for example, in *Allah v. Chambers-Smith*, a case in the Southern District of Ohio that was ongoing at the time this case was also pending before the District Court, Defendants rejected that position, instead stipulating to an agreement to "consider and treat all mail sent from federal courts to incarcerated persons as legal mail, whether or not the mail has a control number, and said mail sent from federal courts shall be processed and handled as legal mail under ODRC Policy No. 75-MAL-03." Stipulated Order Regarding Legal Mail from Fed. Cts., Dkt. No. 91, No. 2:22-cv-21-EAS-KAJ, at 6 (S.D. Ohio June 25, 2024). Pursuant to this stipulation

and agreement, Defendants soon thereafter settled with the plaintiff there—a prisoner at an ODRC-administered institution—who similarly alleged that his court mail did not have control numbers and was therefore being processed, read, and opened outside his presence. *See id.*; Joint Status Rep. in Response to Order, Dkt. No. 93, *id.* (S.D. Ohio July 11, 2024); Stipulation of Dismissal *with Prejudice*, Dkt. No. 99, *id.* (S.D. Ohio Oct. 18, 2024).[6]

Judicial estoppel prevents Defendants from taking an inconsistent approach here. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position[.]" (citation omitted)). That is because "[t]he doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Id.* (citation omitted). But that is exactly what Defendants are trying to do here by maintaining that they somehow have a "legitimate governmental interest" that justifies the control-number policy as it applies to courts but refusing to maintain that same position in similar suits like *Allah*. *Turner*, 482 U.S. at 89.

---

[6] The Court may take judicial notice of filings in court proceedings. *See Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999).

At the very *least*, such inconsistent litigation positions further solidify that the logical connection between the regulation and the objective of combatting contraband is "so remote as to render the policy arbitrary or irrational," *id.* at 89-90, and Defendants' "disregard for established regulations relating to the delivery of legal mail gives ris[e] to an inference of arbitrary or capricious action," *Livingston County*, 796 F.3d at 646 (citation modified) (quoting *Keohane*, 992 F.2d at 610).

**B.     The Remaining *Turner* Factors Further Prove The Unreasonableness Of The Policy.**

Because the first *Turner* factor is not met, "the regulation is unconstitutional, and the other factors do not matter."  *Hanrahan*, 905 F.3d at 954 (quoting *Muhammad*, 35 F.3d at 1084).  But even if the Court were to reach the remaining *Turner* factors, none counsel in favor of a ruling for Defendants.

**1. There Are No Alternative Means Of Exercising Their First Amendment Right To Legal Mail That Remain Open To Prisoners.**

As to the second *Turner* factor, there are no "alternative means of exercising" the First Amendment right to legal mail "that remain open to prison inmates," *Turner*, 482 U.S. at 90, as both federal and state courts have made clear that they will refuse—and *are* refusing—to follow the control-number policy.  *See, e.g.*, Wittrup Dep., R.47, PageID #397-398 (stating that complaints were received from the federal courts about the control-number policy); *Straughter v. Eddy*, No. 2:23-cv-1268, 2023 WL 6290069, at *5 (S.D. Ohio Sep. 27, 2023) (stating its concern

with "the fact that unless the Clerk obtains a control number for every piece of mail sent to Plaintiff, Plaintiff's explicit request for mail from this Court to be treated as 'legal mail' will continue to be denied," but denying plaintiff's request to "seek this Court's compliance with the ODRC [control-number] policy" because of the "extraordinary administrative burden that the new ODRC policy appears to impose on this Court and on all courts of law that send legal mail to inmates"); Ex. E to Pet. for Writ of Mandamus, *State ex rel. Miller v. Foley*, No. 2022-1521, at 20 (Ohio Dec. 12, 2022) (letter from the Montgomery County Clerk of Courts denying plaintiff's request for his legal mail to contain control numbers); Wittrup Dep., R.47, PageID #388 (stating that there is "no data" on "the percentage of state courts that comply with the policy and actually obtain control numbers"); Hum. Rts. Def. Ctr. et al. Br. 10 n.7 ("A smattering of county courts use control numbers.  But several state courts, including Cuyahoga County Common Pleas, do not, which means the timely delivery of court mail depends almost entirely on where an incarcerated person was convicted.").  And prisoners have no way of forcing courts to follow the policy, meaning legitimate legal mail from the courts *will* be, and *is*, opened, read, and processed outside the presence of prisoners against their wishes, and without prisoners being able to do *anything* to prevent such unconstitutional actions.

The District Court disagreed with the above, confusingly concluding—despite the fact that prisoners have *no* way of forcing courts to follow the policy, and despite

the fact that courts have unequivocally expressed their *refusal* to follow the policy, notwithstanding prisoners' requests that they do so—that "the Policy itself presents prisoners with alternative means to have mail from courts opened in their presence simply by requesting that courts obtain and affix control numbers to legal mail sent to inmates." Summ. J. Order, R.50, PageID #440.

The District Court claimed to find support for this conclusion in a single, out-of-circuit case—*Fontroy v. Beard*, 559 F.3d 173 (3d Cir. 2009). In *Fontroy*, the question before the Third Circuit was whether Pennsylvania's control-number policy was constitutional. The Pennsylvania policy—unlike Defendants' policy here, which requires a unique control number for each individual piece of mail—only required issuance of a single control number to each sender, which senders would affix to all mail, in order for such mail to be treated as privileged correspondence. *Id.* at 175-176. The District Court here described *Fontroy* as determining that the Pennsylvania control-number policy presented an "alternative means to accommodate prisoners' right to mail" despite "all courts ha[ving] refused to" follow that policy. Summ. J. Order, R.50, PageID #440-441 (citation modified).

But the District Court overread *Fontroy* and misstated its holding. Indeed, the Third Circuit recognized in *Fontroy* the Pennsylvania control-number policy's central defect, explicitly noting that it was "concerned that [prisoners] cannot force . . . courts to obtain and use Control Numbers" and concerned that "all courts

45

have refused [prisoners'] repeated requests to do so." *Id.* at 180. And the court went out of its way to explain that the Pennsylvania control-number policy as "applied to court mail is even more onerous than as applied to legal mail [from other entities]. The inmate has no relationship with the sender and cannot require the sender to apply for and use a control number. Nor can the [Pennsylvania Department of Corrections (DOC)] or a court." *Id.* (citation omitted). And "[f]inally," the court observed, "unlike most attorney communications, most incoming court correspondence either cannot or will not be made by phone or in person." *Id.* The court concluded that "these problems make the DOC's new mail policy a less-than-ideal means of accommodating the Inmates' important First Amendment rights." *Id.* at 180-181.

Despite these concerns, there were a few characteristics of Pennsylvania's legal-mail policies that led the Third Circuit to determine that that the control-number requirement passed *Turner*'s second factor. First, Pennsylvania legal-mail policies presented prisoners with *actual* alternative means of ensuring that even court correspondence without a control number was treated as privileged correspondence, including the fact that "the DOC treats hand-delivered court" correspondence "as Privileged Correspondence even without a Control Number." *Id.* at 180. And although these alternatives were "less-than-ideal means of accommodating the Inmates' important First Amendment rights," the Third Circuit determined that they were nonetheless alternatives that were available. *Id.* at 180-

181. Second, the court determined that "Control Numbers are easily obtained upon request and, when used, allow the Inmates to communicate with . . . courts just as they did under the DOC's old mail policy." *Id.* at 180.

But unlike Pennsylvania's policies, Defendants' policy contains *no* alternatives to the control-number requirement, such as hand delivery. Mail not containing a valid control number is "*automatically* treated as regular mail, regardless of the return address on the envelope." Buchanan Aff., R.44-6, PageID #297 (emphasis added). And Defendants' requirement that *each piece of legal mail* must contain a unique control number, as opposed to the one control number required in *Fontroy* for *each legal entity*, means control numbers here—unlike the control numbers in *Fontroy*—are not "easily obtained upon request." *Id.* The number of courts that have refused to follow the control-number policy here bears that out. *See, e.g.*, Order & R. & R., Dkt. No. 9, *Swain v. Chambers-Smith*, No. 2:23-cv-2809, at 10 (S.D. Ohio Dec. 19, 2023) (ordering, without deciding any "underlying legal or constitutional issues," and "for the purpose of managing *this case* in a timely and efficient manner," that ODRC treat "mail from this Court addressed to the inmate-plaintiff in this case" as "legal mail under *Sallier*" even without a control number); Order, Dkt. No. 44, *id.*, at 1-2 (S.D. Ohio Dec. 3, 2024) (holding ODRC "in contempt for failure to obey the Court's" prior order to treat legal mail "from this Court addressed to Mr. Swain as legal mail" even without a

47

control number, and ordering "Defendant ODRC to pay Mr. Swain $100.00 as a sanction"); *State v. Brooks*, No. 24CA27, 2025 WL 1190151, at 1 n.1 (Ohio Ct. App. Apr. 21, 2025) (noting denial of "Request for Court to Obtain Control Number").

Indeed, the court in *Kendrick v. Chambers-Smith*, in ordering ODRC to treat mail in *that* case as legal mail regardless of whether it had a control number, took pains to lament the fact that "ODRC's new control number requirement" has "generated significant motion practice, delay, and administrative cost in many cases in this Court, as well as several lawsuits." Order Concerning Mail from this Ct., Dkt. No. 38, No. 1:22-cv-170, at 3 (S.D. Ohio Jan. 25, 2024).[7]

*Fontroy* therefore provides no support for the District Court's holding. And even if *Fontroy* could be read the way the District Court reads it, it is unpersuasive. It makes no sense for "the Policy itself" to present "prisoners with alternative means to have mail from courts opened in their presence," Summ. J. Order, R.50, PageID #440, when "courts have refused [prisoners'] repeated requests" to obtain and use control numbers, *Fontroy*, 559 F.3d at 180, and mail not containing a valid control

---

[7] Relatedly, the court went on to emphasize concerns that because of the control-number requirement, "mail from this Court—often requiring the inmate to take action within a limited number of days—is delayed without tracking or recourse, is copied with pages missing, or is simply not delivered at all," and that prisoners "cannot timely proceed in their cases if institutional mailroom staff has unfettered control over whether, when, and in what form they receive this Court's orders." Order Concerning Mail from this Ct., Dkt. No. 38, *Kendrick v. Chambers-Smith*, No. 1:22-cv-170, at 3-4 (S.D. Ohio Jan. 25, 2024).

number is "automatically treated as regular mail, regardless of the return address on the envelope," Buchanan Aff., R.44-6, PageID #297.  The District Court's holding consequently leaves prisoners between a rock and a hard place, allowing their legal mail to be opened, read, and potentially tampered with outside their presence, irrespective of whether prisoners request that courts follow the policy.

**2. Accommodation Of Prisoners' First Amendment Rights Will Have Minimal Impact On Guards And Other Prisoners, And On The Allocation Of Prison Resources Generally.**

Under the third *Turner* factor, there will be minimal "impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," since federal courts are *already* being treated as *informally* exempt from the policy.  *Turner*, 482 U.S. at 90; *see* Wittrup Dep., R.47, PageID #397-400.  ODRC would just have to ensure that such an *informal* policy is routinely being followed *formally*[8] and in *all* prisons

---

[8] It appears that on September 23, 2025—seven months after the District Court here decided the cross-motions for summary judgment—Defendants passed an amendment to Policy No. 75-MAL-03 which states that "[a]ll mail bearing a valid return address of a federal court shall be treated as legal mail.  Federal court mail does not need a control number to be processed as legal mail."  OHIO DEP'T OF REHAB. & CORR., *Incarcerated Population Legal Mail* 2, No. 75-MAL-03 (Sep. 23, 2025), https://perma.cc/4UCV-2TJU.  But the Ohio Administrative Code still states that mail from *any* court must be "marked with a valid control number" to be considered "[l]egal mail," OHIO ADMIN. CODE 5120-9-17(B)(2), ODRC's webpage on legal mail still reads as requiring *all* courts to register for and obtain a control number, *Legal Mail*, *supra*, and, of course, Defendants have continued to maintain in this case that the control-number policy as applied to all courts is badly needed to

it administers, and apply such an exemption to state courts as well. Such accommodation is minimal.

The District Court concluded otherwise by determining that accommodation of prisoners' First Amendment right to legal mail from the courts would have a significant " 'ripple effect' on prison staff, inmates, and prison resources generally." Summ. J. Order, R.50, PageID #441. In support of this determination, the District Court credited "Defendants['] conten[tion that] the Policy has curtailed the conveyance of drug contraband into ODRC institutions, led to the elimination of hundreds of invalid registrations for attorneys and law firms, increased overall security and safety for the institutions, employees, and community partners, and allows for better allocation of ODRC employee time." Summ. J. Order, R.50, PageID #441.

But as already detailed, *see supra* pp. 37-38, the control-number policy has *not* curtailed the conveyance of drug contraband into ODRC institutions. Indeed, total reported drug-contraband incidents have gone significantly *up* in recent years. *See* Contraband Incidents Graph, R.44-4, PageID #292; Hum. Rts. Def. Ctr. et al. Br. 24 n.14.

---

combat contraband. In light of these facts, not only is it far from clear that a formal policy change has been effected, but the recent amendment to Policy No. 75-MAL-03 further undermines ODRC's claim that there is a "valid, rational connection between the prison regulation and the" "governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (citation modified).

Moreover, the "elimination of hundreds of invalid registrations for attorneys and law firms," Summ. J. Order, R.50, PageID #441, has absolutely *nothing* to do with the impact accommodation of prisoners' First Amendment right to legal mail from the *courts* will have "on guards and other inmates, and on the allocation of prison resources generally," *Turner*, 482 U.S. at 90.

Finally, Defendants' contention that the control-number policy as applied to courts has "increased overall security and safety for the institutions, employees, and community partners, and allows for better allocation of ODRC employee time," Summ. J. Order, R.50, PageID #441, cannot be credited given the fact that, again, Defendants are *already* treating a subset of courts as informally exempt from the policy. *See* Wittrup Dep., R.47, PageID #397-400. If the policy as applied to courts really has increased "security and safety," and has "allow[ed] for better allocation of ODRC employee time," one would expect Defendants to *actually follow* such a policy. Summ. J. Order, R.50, PageID #441.

Because there will be minimal "impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," the third *Turner* factor counsels against concluding that the control-number policy is "reasonably related to legitimate penological interests." *Id.* at 89-90.

51

### 3. There Are Obvious, Easy Alternatives To The Control-Number Policy That Fully Accommodate Prisoners' Rights At *De Minimis* Cost To Penological Interests.

Finally, at the fourth *Turner* factor, the Supreme Court has stated that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 90. But "[b]y the same token," the Court has also stated that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, [and] is an 'exaggerated response' to prison concerns." *Id.* "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

Quinn continues to maintain that the "logical connection between the regulation and the asserted goal" of combatting contraband is "so remote as to render the policy arbitrary or irrational." *Id.* at 89-90; *see supra* pp. 35-43. But if the Court disagrees, then there are still "ready alternatives" available "that fully accommodate[ ]" prisoners' "rights at *de minimis* cost to valid penological interests," as ODRC can simply exempt all courts from the control-number policy, which is what it is *already* doing informally for federal courts. *Turner*, 482 U.S. at 90-91; *see* Wittrup Dep., R.47, PageID #397-400.

Indeed, virtually every state—forty-three, to be exact—the District of Columbia, and the federal Bureau of Prisons do *not* impose onerous control-number-like requirements for legal mail, usually just requiring a proper return address or some other indication that the mail is coming from a legal entity. *See, e.g*, CAL. CODE REGS. tit. 15, § 3143; D.C. DEP'T OF CORR., *Inmate Correspondence and Incoming Publications* § 13, Pol'y & Proc. No. 4070.4G (Apr. 22, 2024), https://perma.cc/TP7F-CRTB; 28 C.F.R. § 540.2(c). But of the very few states that have policies even remotely similar to Ohio's, the vast majority completely exempt *all* courts from their online-portal requirements. *See, e.g.*, FLA. ADMIN. CODE ANN. r. 33-210.102(5) (2025); 103 MASS. CODE REGS. 481 (2022); MASS. DEP'T OF CORR., *Privileged Mail Processing Changes* (Feb. 22, 2024), https://perma.cc/656F-BFJY; MINN. DEP'T CORR., *Mail* 1-2, 10, Pol'y No. 302.020.02 (Feb. 12, 2026), https://perma.cc/FFD6-NRUS; KY. CORR., *Inmate Correspondence* 2, 7, Pol'y & Proc. No. 16.2 (Oct. 15, 2024), https://perma.cc/RX22-5374.

The existence of this "obvious, easy alternative[ ]" to Ohio's policy—which is to exempt all courts from the control-number requirement—is "evidence that [Ohio's] regulation is not reasonable" and is an " 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90, 93; *see also Flagner*, 241 F.3d at 487 ("[W]e afford no deference to the policies and judgments of prison officials if . . . 'officials have exaggerated their response.' " (quoting *Pell*, 417 U.S. at 827)). And again, such

53

a "ready alternative" "fully accommodates" prisoners' rights "at *de minimis* cost to valid penological interests" considering the fact that all ODRC would have to do is to make their informal federal-court exemption formal and apply such an exemption to state courts as well. *Turner*, 482 U.S. at 90-91; *see* Wittrup Dep., R.47, PageID #397-400.

## CONCLUSION

For the foregoing reasons, the Court should reverse the District Court's decision denying Quinn's motion for summary judgment on his First Amendment claim. The Court should also reverse the District Court's decision granting in part Defendants' cross-motion for summary judgment on the same First Amendment claim.

March 17, 2026

Respectfully submitted,

/s/ *Jessica C. Huang*

NEAL KUMAR KATYAL
JESSICA C. HUANG
 *Counsel of Record*
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7595
jhuang@milbank.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,929 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

March 17, 2026

/s/ *Jessica C. Huang*
Jessica C. Huang

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on March 17, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

March 17, 2026

/s/ *Jessica C. Huang*
Jessica C. Huang

*Counsel for Plaintiff-Appellant*

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g), Plaintiff-Appellant Jeremy Quinn, Jr. hereby designates the following relevant district court documents:

| Record Entry Number | Description | Page ID |
|---|---|---|
| 1 | Complaint | 1-10 |
| 1-4 | Ex. A-1 Emails dated 10/9/2021 to 11/13/2021 | 22 |
| 1-5 | Ex. A-2 Emails dated 11/20/2021 to 11/24/2021 | 23 |
| 1-6 | Ex. B-1 Emails dated 10/21/2021 to 11/13/2021 | 24 |
| 1-7 | Ex. B-2 Emails dated 11/13/2021 to 11/20/2021 | 25 |
| 1-8 | Ex. B-3 Email dated 11/24/2021 | 26 |
| 8 | Defendants' Motion to Dismiss | 57-65 |
| 18 | Order Granting Motion for Appointment of Counsel | 111 |
| 20 | Order Directing Supplemental Briefing on Motion to Dismiss | 114 |
| 23 | Memorandum Opinion & Order Amending Complaint and Granting in Part Motion to Dismiss | 132-139 |
| 24 | Judgment Entry on Complaint Amendment and Partial Dismissal | 140 |
| 26 | Rule 26(f) Report Consenting to Magistrate Judge | 147-150 |
| 33 | Order Granting Motion for Joinder of Defendant Chambers-Smith | 188-191 |

| Record Entry Number | Description | Page ID |
|---|---|---|
| 43 | Plaintiff's Motion for Summary Judgment | 237-245 |
| 44 | Defendants' Motion for Summary Judgment | 246-268 |
| 44-1 | Ex. 1 Affidavit of Vinko Kucinic | 269-272 |
| 44-3 | Ex. 2 to Kucinic Affidavit (Legal Mail Graph) | 291 |
| 44-4 | Ex. 3 to Kucinic Affidavit (Contraband Incidents Graph) | 292 |
| 44-6 | Ex. 2 Affidavit of Tim Buchanan | 294-298 |
| 44-11 | Ex. 5 to Buchanan Affidavit (Feb. 1, 2022 Policies) | 325-343 |
| 47 | Deposition of Brian Wittrup | 368-419 |
| 50 | Order on Cross-Motions for Summary Judgment | 424-443 |
| 51 | Judgment Entry on Summary Judgment | 444-445 |
| 58 | Order on Motion for Reconsideration | 482-487 |
| 59 | Notice of Appeal | 488 |