**No. 25-3845**
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JEREMY QUINN, JR., | : | On Appeal from the |
| Plaintiff-Appellant, | : | United States District Court |
| | : | for the Northern District of Ohio |
| v. | : | Eastern Division |
| | : | |
| JOHN/JANE DOE, ET AL., | : | District Court Case No. |
| Defendants-Appellees. | : | 3:22-CV-00661 |
| | : | |

## BRIEF OF APPELLEES

DAVE YOST
Attorney General of Ohio

MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record*
SAMUEL C. PETERSON
Deputy Solicitor General
MARCY A. VONDERWELL
JENNIFER A. DRISCOLL
Assistant Attorneys General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellees*
 *John/Jane Doe, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ..........................................viii

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF THE ISSUES......................................................................2

INTRODUCTION ......................................................................................3

STATEMENT ............................................................................................4

I. For many years, the Department struggled to combat the influx of illegal drugs through the prison mail system................................................4

II. The Department updated its mail policies to address the smuggling of illegal drugs...........................................................................................7

III. The Department's revised policies have reduced significantly the amount of contraband entering prisons through the mail. ...................... 11

IV. The District Court rejected Jeremy Quinn's challenges to the Department's legal-mail policy. ........................................................... 12

SUMMARY OF THE ARGUMENT ................................................................ 15

ARGUMENT............................................................................................ 21

I. The Department's legal-mail policy does not violate Quinn's rights.......23

A. Quinn has not asserted a valid legal-mail claim..................................23

B. The Department's legal-mail policy is consistent with this Court's *Sallier* decision..................................................................................27

C. The Department's legal-mail policy satisfies *Turner*'s four-part balancing test. ..................................................................................32

D. Department officials are entitled to qualified immunity. ...................42

II. Neither Quinn, nor any of his *amici*, provide a compelling reason why the Court should reverse the district court's judgment. .........................44

    A. The Department's legal-mail policy is not undermined by the fact that it excuses federal courts from the control-number requirement. ........................................................................................ 45

    B. Neither Quinn nor his amici provide any feasible alternatives to the Department's legal-mail policy. ........................................................48

    C. Quinn does not persuasively distinguish the Third Circuit's decision in *Fontroy*. ................................................................. 51

    D. Isolated examples of problems with prison mail delivery do not show that the Department's legal-mail policy is facially unconstitutional and systemically invalid. ........................................53

    E. Mail inmates receive from courts is not subject to a five-page limit. ... 57

CONCLUSION ..............................................................................................58

CERTIFICATE OF COMPLIANCE ................................................................59

CERTIFICATE OF SERVICE ........................................................................60

DESIGNATION OF DISTRICT COURT RECORD ..........................................61

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*ACLU Fund of Mich. v. Livingston Cnty.*,
   796 F.3d 636 (6th Cir. 2015) ................................................................26

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ............................................................... 42, 43

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ..............................................................34

*Bethel v. Jenkins*,
   988 F.3d 931 (6th Cir. 2021) ............................................... 32, 33

*Brown v. Annette Chambers-Smith*,
   No. 2:22-cv-2469, 2022 U.S. Dist. LEXIS 186172 (S.D. Ohio Oct.
   11, 2022) ................................................................46

*Castillo v. Cook Cnty. Mail Room Dep't*,
   990 F.2d 304 (7th Cir. 1993) ...............................................37

*Christopher v. Harbury*,
   536 U.S. 403 (2002) ................................................................26

*Citizens in Charge, Inc. v. Husted*,
   810 F.3d 437 (6th Cir. 2016) ............................................... 19, 42

*Cont'l Res., Inc. v. N.D. Bd. of Univ.*,
   136 F.4th 778 (8th Cir. 2025) .............................................56

*Florence v. Bd. of Chosen Freeholders*,
   566 U.S. 318 (2012) ................................................. 23, 34, 40

*Fontroy v. Beard*,
   559 F.3d 173 (3d Cir. 2009) .............................................*passim*

*Guajardo-Palma v. Martinson*,
   622 F.3d 801 (7th Cir. 2010) ...............................................30

*Johnson v. Briarly,*
No. 3:22-cv-00153-JHM, 2023 WL 4747688 (W.D.Ky. July 25, 2023) .................................................................................. 35

*Jones v. Brown,*
461 F.3d 353 (3d. Cir. 2006) ............................................... 25

*Keenan v. Hall,*
83 F.3d 1083 (9th Cir. 1996) .............................................. 37

*Knop v. Johnson,*
977 F.2d 996 (6th Cir. 1992) ................................... 22, 24, 27

*Lewis v. Casey,*
518 U.S. 343 (1996) ....................................................*passim*

*Martin v. Brewer,*
830 F.2d 76 (7th Cir. 1987) ............................................31, 37

*Merriweather v. Zamora,*
569 F.3d 307 (6th Cir. 2009) ................................................28

*Muhammad v. Pitcher,*
35 F.3d 1081 (6th Cir. 1994) ........................................ 24, 33

*Ohio Just. & Policy Ctr. v Chambers-Smith,*
No. 1:25-cv-291, 2026 WL 369374 (S.D. Ohio Feb. 10, 2026) .................... 48, 51

*Okoro v. Scibana,*
63 Fed. App'x 182 (6th Cir. 2003) ...................................... 55

*Overton v. Bazzetta,*
539 U.S. 126 (2003) ....................................... 18, 39, 40, 49

*Pell v. Procunier,*
417 U.S. 817 (1974) ....................................... 24, 32, 33, 34

*Pilgrim v. Littlefield,*
92 F.3d 413 (6th Cir. 1996) ........................................... 16, 26

*Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*,
  894 F.3d 235 (6th Cir. 2018) ....................................................56

*Price v. Johnston*,
  334 U.S. 266 (1948).................................................................32

*Roskam Baking Co. v. Lanham Mach. Co.*,
  288 F.3d 895 (6th Cir. 2001) ..................................................46

*Sallier v. Brooks*,
  343 F.3d 868 (6th Cir. 2003) ..........................................*passim*

*Stanley v. Vining*,
  602 F.3d 767 (6th Cir. 2010) ..........................................*passim*

*State v. Lockhart*,
  2025-Ohio-5440 (Ohio Ct. App. 2025) ................................31, 38

*Straughter v. Eddy*,
  No. No. 2:23-cv-1268, 2023 WL 6290069 (S.D. Ohio Sept. 27, 2023) ......................................................................43

*Taylor v. Barkes*,
  575 U.S. 822 (2015).................................................................44

*Teledyne Industries, Inc. v. NLRB*,
  911 F.2d 1214 (6th Cir. 1990) .................................................47

*Thornburgh v. Abbott*,
  490 U.S. 401 (1989) .......................................................37, 40, 41

*Turner v. Safley*,
  482 U.S. 78 (1987) ..........................................................*passim*

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) .................................................55

*State ex rel. Ware v. Vigluicci*,
  177 Ohio St. 3d 381 (2024) ....................................................57

*Wolff v. McDonnell*,
418 U.S. 539 (1974) ...................................................................................*passim*

*Zimmerman v. Tribble*,
226 F.3d 568 (7th Cir. 2000) ................................................................ 55

**Statutes**

42 U.S.C. §1983 ....................................................................................... 12

Fed.R.Evid. 201 ...................................................................................... 56

Ohio Admin. Code §5120-9-17 ............................................................ 4, 8

**Other Authorities**

Azam Ahmed et al., *No Pills or Needles, Just Paper: How Deadly Drugs
are Changing*, New York Times, March 21, 2026 ................................. 3

*Bishop v. Forshey*, No. 2:25-cv-292 (S.D. Ohio), R.10, Compl. .............................. 54

Chris Lloyd, *The story of the first man to escape the Tower of London and
his impact on Durham*, The Northern Echo, Nov. 29, 2019 ................................. 3

Commonwealth of Pennsylvania, Request an Attorney Control
Number for Sending Privileged Mail ................................................. 52

Definitions (May 13, 2026) ...................................................................... 22

*El-Barseem K. Allah v. Annette Chambers-Smith*, 2:22-cv-00021 (S.D.
Ohio), R.91, Stipulated Order ................................................... 9, 47

Incarcerated Population Legal Mail, 75-MAL-03 (2025) ........................ 4, 9, 22, 48

Incarcerated Population Mail, 75-MAL-01 (Dec. 15, 2025) ........................ 11, 21, 58

*Kendrick v. Chambers*, No. 1:22-cv-170 (S.D. Ohio), R.32, 33,
Supplemental Documents ................................................................ 55

Laura A. Bischoff et al., *Smuggled Drugs Fuel Chaos Inside Ohio Prisons*,
Columbus Dispatch, March 29, 2026 ................................ 3, 5, 19, 35

Legal-Mail Policy, 75-MAL-03 (2022) ....................................................... 7, 8, 22

Printed Materials Policy, 75-MAL-02 (2020)....................................................11, 57

*Swain v. Chambers-Smith*, No. 2:23-cv-2809 (S.D. Ohio), R.26, Am.
    Compl..................................................................................................54

## STATEMENT REGARDING ORAL ARGUMENT

The Department of Rehabilitation and Correction agrees that oral argument would assist the Court in resolving this appeal. This appeal involves important constitutional questions about a policy that has significant implications for the safety and security of the Department's institutions.

# JURISDICTIONAL STATEMENT

Quinn's jurisdictional statement is complete and correct.

# STATEMENT OF THE ISSUES

1. Has Quinn asserted a valid constitutional claim, even though he has not alleged that he was prejudiced by the Department's legal mail policy?

2. Is the Department's legal-mail policy, which establishes a process for verifying the senders of legal mail, constitutional?

3. Did the district court err by concluding that the law applicable to Quinn's claims was clearly established and that Department officials therefore were not entitled to qualified immunity?

**INTRODUCTION**

For as long as there have been prisons, there has been prison contraband. The first person to be imprisoned in the Tower of London, for example, escaped in 1101 using a rope that was smuggled into the prison in a flagon of wine. Chris Lloyd, *The story of the first man to escape the Tower of London and his impact on Durham*, The Northern Echo, Nov. 29, 2019, available at https://perma.cc/X2V9-CGBN. The way contraband sneaks past the prison gates may have changed over time, but smuggling is no less pressing of an issue for today's wardens. Contraband, like water, finds the path of least resistance.

That path now includes plain, ordinary, paper. Prisons around the country are dealing with an influx of highly dangerous synthetic drugs that can slip undetected into prisons disguised as letters, greeting cards, and even legal correspondence. Azam Ahmed et al., *No Pills or Needles, Just Paper: How Deadly Drugs are Changing*, New York Times, March 21, 2026, available at https://perma.cc/T7AY-3YEL. Ohio is no stranger to the problem of drug-soaked mail—or the death and chaos that it causes. *See* Laura A. Bischoff et al., *Smuggled Drugs Fuel Chaos Inside Ohio Prisons*, Columbus Dispatch, March 29, 2026, available at https://perma.cc/3FHF-LUJK. Until recently, Ohio inmates were regularly receiving letters and other

correspondence soaked in synthetic narcotics, marijuana—and even bug spray. R.44-1, Vinko Kucinic Affidavit ¶9, PageID#270.

The Department changed its mail policies in an attempt to restrict the flow of illegal drugs into Ohio's prisons. Most significantly it now requires all legal mail to bear a unique control number. R.44-6, Buchanan Affidavit ¶11.a, PageID#296–97; *see also* Ohio Admin. Code §5120-9-17(B)(2); Incarcerated Population Legal Mail, 75-MAL-03 (2025), available at https://perma.cc/YC9X-JZ4D. A control number is, in many ways, similar to the type of one-time-use code that websites, including the Public Access to Court Electronic Records ("PACER") system, use for multi-factor authentication purposes.

The Department's updated legal-mail policy is constitutional under both Supreme Court and panel precedent. As the Supreme Court has recognized that "[r]unning a prison is an inordinately difficult undertaking." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). The Department's legal-mail policy merely seeks to make that task easier and safer. The district court was right to uphold it.

## STATEMENT

**I.    For many years, the Department struggled to combat the influx of illegal drugs through the prison mail system.**

Drug abuse in prison is an endemic problem that has proved to be difficult to combat—and impossible to eradicate. *See* R.44-1, Kucinic Affidavit ¶4–5,

4

PageID#269; R.44-6, Buchanan Affidavit, ¶¶3–5, PageID#294. One of the primary ways that drugs are introduced into prisons is through the mail. *See* R.44-1, Kucinic Affidavit ¶6, PageID#269–70. Between 2020 and 2024, the Department averaged over 700 attempts per month to smuggle drugs into its prisons through the mail. *Id.* at PageID#270. At least once a day, the mail in question purported to be legal mail. R.47, Brian Wittrup Deposition, PageID#378.

Mere inspection of the mail was not adequate to combat smuggling. In many cases, the drugs were infused into the mail itself. Inmates would regularly receive paper soaked with drugs like marijuana, synthetic narcotics, opioids, and even bug spray. R.44-1, Kucinic Affidavit ¶9, PageID#270–71; *see also* R.44-6, Buchanan Affidavit ¶4, PageID#294. And the drugs were not detectable by traditional means. R.44-6, Buchanan Affidavit ¶8, PageID#296; R.47, Wittrup Depo., PageID#404; *see also* Bischoff, *Smuggled Drugs Fuel Chaos Inside Ohio Prisons*, https://perma.cc/3FHF-LUJK (reporting that the drugs being smuggled into Ohio prisons often "evade detection in standard toxicology tests"). As of 2024, in prison a single 8 1/2 x 11 sheet of drug-soaked paper was worth $4,500 on average. R. 44-1, Kucinic Affidavit ¶9, PageID#270–71.

These smuggling attempts were not limited to regular mail. Illegal contraband was also disguised as legal mail. *See id.* The Department discovered contraband

disguised as a court transcript in a letter that purported to be from the Franklin County Clerk of Courts. R.44-1, Kucinic Affidavit ¶7.a, PageID#270. And it discovered contraband in letters bearing the return address of the Cuyahoga County Clerk of Courts and of the United States District Court for the Southern District of Ohio. *Id.* at ¶¶7.b, 7.d, PageID#270.

Ohio inmates learned that it was easier to smuggle drugs into prison if they came in letters purportedly sent by a court or an attorney. Until the Department revised its legal-mail policy in 2025, inmates received the original physical documents sent as legal mail. At the time, regular mail was opened and copied, with inmates receiving copies of the contents—not the original documents. *See* R.44-6, Buchanan Affidavit ¶7.b, PageID#295. Legal mail, by comparison, was not copied or read by Department staff. *Id.* at ¶7.a, PageID#295. It was opened in front of an inmate, inspected for obvious contraband, and then the original contents of the legal mail were given to the inmate. *See id.*

Very little needed to be done to qualify for lenient treatment as legal mail. All that was required was a return address belonging to an attorney or a court. R.44-1, Kucinic Affidavit ¶6, PageID#269–70; R.44-6, Buchanan Affidavit ¶7, PageID#295; R.47, Wittrup Depo., PageID#391. Unsurprisingly, inmates sought to exploit those lax requirements. On at least two occasions, the Department intercepted letters

from inmates that contained instructions on how to smuggle drugs into prison disguised as legal mail.  R.44-2, Kucinic Affidavit, Ex.1, PageID#283, 285.

## II.   The Department updated its mail policies to address the smuggling of illegal drugs.

The Department launched an effort in 2020 to combat mail-based smuggling.  It focused first on the ease with which contraband could be disguised as legal mail.  R.44-1, Kucinic Affidavit ¶10¶–11, PageID#271; *see also* R.47, Wittrup Depo., PageID#382–85.  Inspired by a Pennsylvania Department of Corrections policy that addressed similar problems with legal mail, *see id.* at PageID#383, the Department created a task force responsible for developing an "efficient and cost-effective method of combatting the introduction of contraband into the prisons through the mail system while preserving the First Amendment [r]ights of inmates," R.44-1, Kucinic Affidavit ¶¶10–11, PageID#271.

After a testing period, the Department's new legal-mail policy took effect statewide in October 2021.  *See* R.44-1, Kucinic Affidavit ¶13, PageID#271; R.44-6, Buchanan Affidavit ¶11, PageID#296; R.44-8, Buchanan Affidavit Ex.2, PageID#305.  Under that policy, attorneys, courts, and other authorized organizations desiring to send legal mail to an inmate are now required to register with the Department.  R.44-6, Buchanan Affidavit ¶11, PageID#296–97; R.44-11, Buchanan Affidavit Ex. 5, Legal-Mail Policy, 75-MAL-03 (2022), PageID#340–43.  The

Department's staff validates each registration. R.44-6, Buchanan Affidavit ¶11, PageID#296. Parties that successfully register with the Department may send legal mail to inmates by obtaining a control number from an online portal. *See id.* Mail with a control number is treated the same way that legal mail has always been treated. It is opened in front of its intended recipient and, after an inspection for contraband, the mail is given to the inmate. *See* R.44-6, Buchanan Affidavit ¶11, PageID#296; R.44-11, Legal-Mail Policy, 75-MAL-03 (2022), PageID#341. Mail without a control number is treated as regular mail, even if its return address indicates that it came from an attorney, court, or other legal services organization. R.44-6, Buchanan Affidavit ¶11.a.v, PageID#297; *see also* Ohio Admin. Code §5120-9-17(B)(2).

The Department intentionally included mail from courts in the new policy. The Department had a well-documented history of receiving mail disguised as mail from courts. R.44-1, Kucinic Affidavit, ¶¶9, 14–15, PageID#270–71. It therefore determined that it was necessary to include court-sent mail in the new policy; exempting such mail would undermine the goal of reducing mail-based smuggling. *Id.* at ¶15, PageID#271.

Prior to finalizing the new legal-mail policy, the Department's legal staff conducted significant outreach to affected individuals and organizations. R.47, Wittrup Depo., PageID#384–85, 395–96. The Department made several changes because of

the feedback that it received. *Id.* at PageID#384–85. Among other things, the Department created a process that allowed parties to more easily send large amounts of legal correspondence. *See id.*

Despite the Department's outreach, not everyone was happy with the new legal-mail policy. State courts generally complied with the new policy by obtaining control numbers when necessary. *See* R.47, Wittrup Depo., PageID#388, 399–400. Federal courts did not. They pushed back against the control-number requirement. *See id.* at PageID#398, 400.

The Department updated its legal-mail policy in response to the federal pushback and to lawsuits from affected inmates. It reached a settlement in which it exempted federal courts from the control-number requirement. *See El-Barseem K. Allah v. Annette Chambers-Smith et al.,* No. 2:22-cv-21, (S.D. Ohio), R.91, Stipulated Order. As part of that settlement, "the federal courts and their clerks" advised, and agreed to continue to advise, Department officials on "how to identify mail truly sent from federal courts." *Id.* at PageID#665. In 2025, the Department formally amended its policy to reflect that settlement. *See* Incarcerated Population Legal Mail, 75-MAL-03, VI.A.1.a (2025). The amended policy also requires prison staff to copy legal mail in an inmate's presence and give the inmate the copies before shredding the original.

*Id.* at VI.A.6.  The Department still does not read either the original or copied legal mail.  *See id.*

The Department continues to require control numbers from all other parties—including from state courts.  Unlike federal courts, the Department has not exempted state-court mail from the control-number requirement.  It limited the scope of the exception to federal-court mail because, as the original legal-mail policy showed, any weakness in the Department's defenses against contraband would be exploited.  *See* R.47, Wittrup Depo., PageID#402, 407–08; *see also* R.44-1, Kucinic Affidavit ¶15, PageID#271.  The wider the exception, the Department determined, "the more trucks can drive through it."  *Id.* at PageID#407.

The Department has also changed the way it processes regular mail.  Under a policy first adopted in 2023, inmates no longer receive hard copies of regular mail.  *See* R.44-6, Buchanan Affidavit ¶11.b, PageID#297.  Regular mail is now processed at a central location where it is scanned before being delivered to inmates electronically.  *Id.*; R.44-9, Buchanan Affidavit, Ex.3, PageID#317.

Because developing policies to address contraband is an on-going process, the Department recently revised its mail policies to better reflect how it was already handling mail that was not clearly covered by its existing legal and regular mail policies.  The Department's regular-mail policy limits the number of pages of certain types of

correspondence that inmates may receive. *See* Incarcerated Population Mail, 75-MAL-01, VI.C.1.a.i (Dec. 15, 2025), available at https://perma.cc/M5Q6-G6JB. The limits do not apply to all types of mail, however. Among other things, the page limit has never applied to "photocopied material and material printed or downloaded from a computer" when those materials included "[l]egal materials sent by an attorney or court." *See* Printed Materials Policy, 75-MAL-02, IV and VI.C.3 (2020), available at https://perma.cc/8SUH-D2TH. Because the wording of the Department's policies was unclear, the Department amended those policies in December 2025 to clarify that the page limit that applies to regular mail does not apply to correspondence sent by a court—even when that correspondence does not bear a control number. Incarcerated Population Mail, 75-MAL-01, VI.C.1.a (Dec. 15, 2025). It also increased the regular mail page limit from five to fifteen pages. *See id.* Other than the page limit increase, the amendments did not reflect a change in policy; they simply confirmed the Department's long-standing practices. *Cf.* Printed Materials Policy, 75-MAL-02 (2020).

## III. The Department's revised policies have reduced significantly the amount of contraband entering prisons through the mail.

Contraband entering Ohio's prisons disguised as legal mail dropped "precipitously" after the Department adopted its new legal-mail policy. R.47, Wittrup Depo., PageID#379, 395. It went from almost a daily occurrence to something closer

to a monthly one. *Id.* In 2020 there were 370 instances in which legal mail was found to contain contraband. R.44-5, Kucinic Affidavit, Ex.4, PageID#293. In 2023 there were nine. *Id.* The amount of contraband found in all mail (not just legal mail) dropped as well. *See* R.44-2, Kucinic Affidavit, Ex.1, PageID#278; R.44-6, Buchanan Affidavit ¶12.c, PageID#297.

The Department realized other benefits from its revised mail policies. It improved mail delivery efficiency, reduced costs for families and friends of inmates, and allowed the Department to better allocate its staff. R.44-6, Buchanan Affidavit ¶12, PageID#297. It also enabled the Department to identify and remove the names of hundreds of people who had improperly registered as attorneys. *See* R.44-6, Buchanan Affidavit ¶12.b, PageID#297; *see also* R.44-1, Kucinic Affidavit ¶13, PageID#271. Registered individuals may visit or call inmates without being monitored. Perhaps most significantly, the new mail policies "[i]ncreased overall security and safety for the institutions, employees, and community partners." R.44-6, Buchanan Affidavit ¶12.f, PageID#297.

## IV. The District Court rejected Jeremy Quinn's challenges to the Department's legal-mail policy.

Jeremy Quinn was an inmate at the Toledo Correctional Institution when the Department's new legal-mail policy took effect. R.1, Complaint, ¶3, PageID#1–2. Quinn filed a complaint under 42 U.S.C. §1983 in the Northern District of Ohio,

alleging that the legal-mail policy violates his rights under the First, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *Id.* at ¶1, PageID#1. Quinn sought both damages and injunctive relief. *See id.* at Prayer, PageID#9. Specifically, he sought to enjoin the Department's legal-mail policy to the extent that the policy permitted the Department to open, read, and copy any legal mail sent to him by a court, government agency, lawyer, or law firm. *See id.*

The Department moved to dismiss asserting, in relevant part, that Quinn's claims were barred by qualified immunity. R.8, Motion to Dismiss, PageID#62–64. The district court denied the Department's motion with respect to its qualified immunity argument. R.23, Memorandum Opinion and Order, PageID#136–38. While it granted the Department's motion with respect to most aspects of Quinn's complaint, the district court held that the Department had not established that it was entitled to qualified immunity on Quinn's First Amendment claim. *See id.* at PageID#139. It concluded that Quinn had "plausibly allege[d]" that the Department's legal-mail policy violated a clearly established principle of law. *Id.* at PageID#138.

The district court ultimately upheld the Department's legal-mail policy at the summary-judgment stage. After conducting limited discovery, the parties filed cross-motions for summary judgment. *See* R.50, MSJ Order, PageID#425. The

district court granted most of the Department's motion, denying that motion only with respect to the Department's assertion of qualified immunity. It denied Quinn's motion in full. *Id.* at PageID#425–26.

Most significantly, the district court sided with the Department when it came to the merits of Quinn's First Amendment claim. It held that the Department's legal-mail policy does not violate Quinn's First Amendment right to receive legal mail. *Id.* at PageID#435–443. Applying the test the Supreme Court adopted in *Turner v. Safley*, 482 U.S. 78 (1987), the district court held the policy satisfied prong one of *Turner* because there was a valid, rational, connection between the legal-mail policy and the concerns that justified it. R.50, MSJ Order, PageID#439. The undisputed evidence, it held, showed that "the requirement to register for and affix a control number to legal mail allows prison officials to verify that the sender is a known legal entity, and not a nefarious third-party attempting to introduce contraband." *Id.* at PageID#439–40.

The district court found that the three remining *Turner* factors favored the Department as well. Looking to the Third Circuit's decision in *Fontroy v. Beard*, 559 F.3d 173 (3d Cir. 2009), which upheld a policy similar to the one at issue here, the district court held that inmates have an adequate way to protect their First Amendment rights. R.50, MSJ Order, PageID#440–41. The district court also held that

returning to the old legal-mail policy would have negative ripple effects on prison operations. *Id.* at PageID#441–42. Finally, the district court held that Quinn had failed to point to any alternatives to the new legal-mail policy that could achieve the same goals "at a *de minimis* cost to valid penological interests." *Id.* at PageID#442.

Viewing all four *Turner* factors in a light most favorable to Quinn, the district court held that the Department had shown that its legal-mail policy was reasonable and that it did not violate Quinn's First Amendment rights. *Id.* at PageID#443. The court therefore denied Quinn's request for declaratory judgment. *Id.*

Quinn appealed and this Court appointed counsel to represent him. *See* Order, Doc.8-1.

**SUMMARY OF THE ARGUMENT**

**I.** The Department's legal-mail policy does not violate Quinn's constitutional rights. This Court's precedent requires that Quinn show prejudice resulting from any legal-mail violation, which he cannot do. But even if precedent recognizes a free-standing right to receive legal mail from courts, that precedent does not address how to verify that a court was, in fact, the sender. That is all that the Department's policy does. It ensures that mail that purports to come from a court actually does. The policy is a rational response to contraband problems that the Department faces and

15

it easily satisfies the balancing test that the Supreme Court has applied to such policies.

**A.** Quinn cannot prove, and does not even allege, the type of prejudice that the Court has held is necessary to assert a successful claim that interference with an inmate's legal-mail rights hindered his court-access rights. The Court in *Stanley v. Vining*, recognized that, although inmates have a First Amendment right to be free from "unreasonable mail censorship," the First Amendment rarely provides a freestanding legal-mail right. *See* 602 F.3d 767, 771 (6th Cir. 2010) (analyzing inmate's legal-mail claim under "all reasonable theories"). Following *Stanley*, a successful legal-mail claim requires "some allegation that the prison official's conduct amounted to denial of access to the courts or some form of censorship of speech." *Id.* at 770. And an access-to-courts claim requires demonstration of some "actual injury." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). Quinn never alleged, however, let alone proved, such an injury. Nor has he alleged that his mail was censored.

**B.** The Court's decision in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003) does not compel a different conclusion. Although the Court in that case for the first time recognized a right to receive legal mail from courts, *Sallier* simply assumed that the First Amendment guaranteed such a right but never grounded that right in history

or precedent. *See id.* at 873–74, 876–77. And *Sallier* is now limited by the additional prejudice requirement that *Stanley* imposed. *See Stanley*, 602 F.3d at 772–73 (criticizing *Stanley* for imposing a higher burden than previous cases imposed) (Cole, J., dissenting in part).

Even if it had not been limited, *Sallier* still would not be dispositive of Quinn's claim. *Sallier* asked only whether inmates have a right to receive legal mail from courts. *See* 343 F.3d at 876–77. It did not address the question at issue here, which asks how to *identify and confirm* that the sender was in fact a court.

**C.** Whether the Department's legal-mail policy is constitutional is resolved not by *Sallier*, but by the *Turner v. Safley*, 482 U.S. 78 (1987) balancing test. That test asks first whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89 (internal punctuation omitted). If there is, courts must consider three additional factors: whether inmates have alternative means for exercising a right, whether accommodating the right will affect prison operations, and whether prison officials have other, readily available, ways of pursuing their valid penological interests. *See id.* at 90–91.

The Department's legal-mail policy easily satisfies all four *Turner* factors. It is certainly rational. Before adopting its revised legal-mail policy, the Department regularly encountered contraband hidden in fake legal mail. *See* R.47, Wittrup Depo.,

PageID#379, 395.  The policy caused fake legal-mail incidents to drop "precipi-tously."  *Id.* at PageID#379.  They went from a daily to a monthly occurrence.  *Id.* at PageID#379, 395.  That alone is enough to satisfy *Turner*'s first factor.  A prison policy need not be perfect; it must simply not be "arbitrary or irrational."  *Turner*, 482 U.S. at 90.

The Department's policy satisfies *Turner*'s remaining three factors as well.

Inmates have available alternatives for protecting their legal-mail rights.  Namely, they may encourage courts to apply control-numbers where appropriate, which is what Ohio courts are doing.  *See* R.47, Wittrup Depo., PageID#388–89, 397, 399–400.  In upholding the Pennsylvania control-number policy that inspired the policy at issue here, the Third Circuit held that such an alternative satisfies *Turner*'s second factor.  *See Fontroy v. Beard*, 559 F.3d 173, 180–81 (3d Cir. 2009).  And while *Fontroy* noted that such an alternative might be "less-than ideal," *see id.* at 180, alternatives need not be ideal"; "they need only be available," *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).  Even if no alternatives existed that "would not be conclusive."  *Id.*  It would merely be some evidence of the rationality (or lack thereof) of a policy.  *Id.*

As for alternative means of pursuing the Department's penological goals, Quinn suggests only that the Department abandon its new legal-mail policy and return to a policy that was not working.  The undisputed evidence showed that contraband was

regularly making its way into prisons disguised as legal mail.  Returning to that policy would be detrimental to prison operations.  It would again allow undetectable, and often deadly, drugs to flood Ohio's prisons.  *See*  R.44-6, Buchanan Affidavit ¶8, PageID#296; R.47, Wittrup Depo., PageID#404; *see also* Bischoff, *Smuggled Drugs Fuel Chaos Inside Ohio Prisons*, https://perma.cc/3FHF-LUJK.

**D.**  Even if the Court concludes that the Department's legal-mail policy violates Quinn's constitutional rights, it should nevertheless reverse the district court's denial of qualified immunity.  State officials are entitled to qualified immunity if a right they allegedly violated "was not 'clearly established' at the time of the alleged misconduct."  *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).  No right was clearly established here.  The district court cited *Sallier* as the reason for denying qualified immunity, concluding that *Sallier* clearly established a legal right to receive legal mail from courts.  *See* R.50, Order, PageID#434.  But the court below did not discuss *Stanley*, which imposed a heightened standard for legal-mail claims like Quinn's.  At a minimum, the tension between *Sallier* and *Stanley* is enough to show that the law was not "clearly established" at the time the Department adopted its policy.  The lack of clarity in the law is buttressed by the fact that the Third Circuit in *Fontroy* upheld the Pennsylvania control-number policy that inspired the Department's policy at issue here.

**II.** Quinn and his *amici* have few persuasive responses. Quinn relies on *Sallier*, for example, but never discusses *Stanley*. And even on its own terms, *Sallier* does not resolve the verification question at issue here. Quinn's other arguments fare no better. He points to an exception the Department made to its legal-mail policy for mail sent by federal courts. But that exception does not mean that the Department's policy is irrational as applied to state courts. Just because the Department was forced to crack open a window to contraband does not mean that it must also throw open the door.

As for *amici*, they largely focus on problems other inmates have had with mail delivery. Even if true, those problems are not relevant to Quinn's claim. Quinn has not alleged that *he* has experienced any such problems. And the fact that other inmates' mail might have been misdelivered does not entitle Quinn to relief. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996).

Finally, both Quinn and his *amici* assert that court-sent mail without a control number is subject to a five-page limit. That was never the Department's policy and Quinn never claims that *his* mail was subject to a five-page limit. But because the text of existing policies was not always sufficiently clear on that point, the Department amended its policies in December 2025 to unequivocally state that "court mail that is processed as regular mail per the legal mail definition shall not have a page

limit requirement," and that "[a]ll copied pages shall be delivered to" an inmate. Incarcerated Population Mail, 75-MAL-01, VI.C.1.a (Dec. 15, 2025), available at https://perma.cc/M5Q6-G6JB.

## ARGUMENT

This Court's precedent requires inmates asserting First Amendment claims arising from a prison-mail violation to show either prejudicial denial of access to courts or speech censorship. *Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010). Quinn does not allege, much less show, any prejudice or censorship. That alone is fatal to his case.

Even if Quinn could proceed on his First Amendment claim without demonstrating prejudice, the Department's legal-mail policy readily passes muster because it is reasonably related to the Department's interest in preventing contraband from entering Ohio's prisons and does not violate Quinn's rights. Nothing compels a different conclusion. The Court's decision in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003) does not prohibit that policy. And the policy easily satisfies the four-part test that the Supreme Court adopted in *Turner v. Safley*, 482 U.S. 78 (1987). Quinn's contrary arguments provide no compelling reason for the Court to hold otherwise.

Before addressing the merits of Quinn's arguments, it is necessary to briefly address what *is* and *is not* at issue in this case. Quinn's complaint identifies two pieces

21

of court-sent correspondence, one from the Ohio Supreme Court and one from a federal court, that were treated as regular mail because they did not bear a control number. *See* R.1, Complaint ¶¶11, 18, PageID#3–5. Quinn did not allege that, prior to receiving the mail in question, he requested that prison officials open all legal mail in his presence. *See, generally*, R.1, Complaint. Quinn also does not point to any evidence in the record that shows he made such a request. *See, generally*, Quinn Br., Doc.16. In the absence of such a request, the Department had no obligation to treat any mail that Quinn received as legal mail—regardless of the policy that applied. *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992). Because Quinn introduced no evidence on this point, he is not entitled to backward-looking relief.

The scope of the relief available to Quinn is further limited by the current status of the Department's legal-mail policy. At the time Quinn filed his complaint, the policy applied to mail sent by both state and federal courts. *See* R.44-11, Legal-Mail Policy, 75-MAL-03 (2022), PageID#340–43; Definitions at 182 (May 13, 2026), available at https://perma.cc/H9TF-9Y6Q. The policy has since been amended, however, and now makes clear that federal court mail will be treated as legal mail even if it does not bear a control number. Incarcerated Population Legal Mail, 75-MAL-03, VI.A.1.a (2025). Quinn's complaint has become moot to the extent that it relied on arguments about how the Department treats mail from federal courts.

The only remaining issue in this case is thus whether, as a forward-looking matter, the Department's legal-mail policy related to *state court* mail violates Quinn's rights. It does not.

## I. The Department's legal-mail policy does not violate Quinn's rights.

"The difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012). Those difficulties include restricting the flow of illicit materials. No one can deny that the Department is therefore permitted to impose polices designed to "detect and deter the possession of contraband in their facilities." *Id.* at 328. That is what the legal-mail policy at issue here does: It restricts the flow of contraband. And it does so without infringing on inmates' rights. Neither this Court's precedent, nor Supreme Court precedent, holds otherwise.

### A. Quinn has not asserted a valid legal-mail claim.

Before addressing the legal standards against which prison policies are judged, it is necessary to ask whether Quinn has identified a substantive right that has been infringed by the Department's legal-mail policy and whether he has sufficiently alleged a violation of that right. He has not. Quinn argues that the Department's legal-mail policy violates his First Amendment right to receive legal mail. *See* Quinn Br.,

23

Doc.16 at 28. But he has not asserted a valid legal-mail claim under this Court's precedent.

While the Supreme Court has recognized that inmates retain "those First Amendment rights that are not inconsistent with [their] status as … prisoner[s] or with the legitimate penological objectives of the corrections system," *Pell v. Procunier*, 417 U.S. 817, 822 (1974), it has never directly held that those rights include a right to receive confidential legal mail, *see Wolff v. McDonnell*, 418 U.S. 539, 576 (1974). It has assumed without deciding that such rights exist. *See id.*

This Court has gone further and has held that inmates have a First Amendment right to receive mail, *Sallier*, 343 F.3d at 873, and a right of access to the courts, *id.* at 874. Combining those rights, the Court has also held that inmates have greater rights to receive legal mail than they do regular mail. *See id.* Finally, the Court has held that legal mail is not limited to mail from attorneys; it also includes mail inmates receive from courts. *Id.* at 877. But although it has purported to recognize such a right, it never fully explained the legal foundation for that right. And because the "textual footing in the Constitution," was "not clear" and suffered "for lack of internal definition," it proved "far easier to state" such a right than apply it. *Cf. Knop*, 977 F.2d at 1003 (quotation omitted); *cf. also Muhammad v. Pitcher*, 35 F.3d 1081,

1086 (6th Cir. 1994) (Siler, J., dissenting) (noting uncertainty about the source of a claimed legal-mail right).

The Court in *Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010) significantly restrained the loosely defined right that *Sallier* first recognized by adding a prejudice component. It held in that case that an inmate's First Amendment right to receive legal mail is not an end in and of itself. Although inmates have a "First Amendment right to be free from unreasonable mail censorship," *Stanley* held that an inmate alleging that prison officials violated that right by opening and reading legal mail must allege that prison officials' "conduct amounted to denial of access to the courts or some form of censorship of speech." *Stanley*, 602 F.3d at 770; *but see Jones v. Brown*, 461 F.3d 353, 359 (3d. Cir. 2006) (reaching contrary conclusion). In doing so, *Stanley*, over a vigorous dissent, imposed a "higher standard" on inmates making legal-mail claims than *Sallier* would have done. *See Stanley*, 602 F.3d at 772–72 (Cole, J., dissenting in part).

*Stanley* did little more than apply controlling Supreme Court precedent. The Supreme Court has held that it "is the role of courts to provide relief to claimants … who have suffered, or will imminently suffer, actual harm." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). To "state a claim for denial of meaningful access to the courts" plaintiffs must therefore "plead and prove prejudice stemming from an asserted

25

violation." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). And to establish prejudice "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see also Stanley*, 602 F.3d at 770–71. Plaintiffs cannot "invoke intervention of the courts" merely because they are "subject to a governmental institution that was not organized or managed properly." *Lewis*, 518 U.S. at 350. A "healthy inmate," for example, cannot claim a violation of his constitutional right to health care simply because "the prison medical facilities" are inadequate. *Id.* Similar logic applies here.

The Court's decision in *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636 (6th Cir. 2015) does not hold otherwise. That case involved a prison regulation that required incoming mail to be on a 4x6 postcard unless it involved legal mail. *Id.* at 638. A warden at one Michigan prison interpreted "legal-mail" to include mail from courts and mail sent by an attorney with whom an inmate had a "pre-established attorney-client relationship." *Id.* at 639. That interpretation, the Court held, interfered with a "'prisoner's interest in unimpaired, confidential communication with an attorney.'" *Id.* at 643 (quoting *Sallier*, 343 F.3d at 877) (internal quotation omitted)). It recognized, in other words, a right that was derivative of the Sixth

26

Amendment. *See also Knop*, 977 F.2d at 1011 (describing a specific legal-mail claim as a "sub-issue" of an access to courts claim). But that is a different right than the court-access right that Quinn asserts here. As *Stanley* recognized, while inmates have a protected interest in receiving mail, any more expansive right must be independently grounded in due process, access to courts, or the right to counsel. *See Stanley*, 602 F.3d at 769–71

Although Quinn relies on *Sallier* as the basis for his asserted First Amendment right, that decision is not dispositive of this case. *Stanley* is. *Stanley* made clear that inmates must allege some affirmative harm resulting from an alleged violation of an inmate's legal-mail rights. Quinn has not done so. His Complaint did not allege that he suffered the type of harm that the Court's precedent requires. *See* R.1, Complaint. And his Motion for Summary Judgment did not present any evidence of such harm either. R.43, Quinn MSJ, PageID#237–43.

### B. The Department's legal-mail policy is consistent with this Court's *Sallier* decision.

Even if *Stanley* had not limited *Sallier*'s reach, that decision has very little to say about the legal-mail policy at issue here. That is because this case asks a different question than the one at issue in *Sallier*. Everyone agreed in *Sallier* that certain correspondence was sent by a court. *See* 343 F.3d at 876–76. The question in that case was whether *all* mail sent by a court, including general correspondence, should be

treated as legal mail, or whether the only court-sent mail that should receive special treatment is mail that would not otherwise be considered a public record. *See id.* at 877. *Sallier* adopted the first, broader, interpretation. *See id.*

This case begins several steps before *Sallier* and asks a question that case did not: How should prison officials determine whether a specific piece of mail came from a court? *Sallier*'s silence on this issue is highlighted by the Court's decision in *Merriweather v. Zamora*, 569 F.3d 307 (6th Cir. 2009). A Michigan inmate in that case alleged that, by opening his legal mail outside his presence, federal prison officials violated the rights recognized in *Sallier*. *See id.* at 310. To qualify for legal-mail treatment, the policy at issue in *Merriweather* imposed a special marking requirement on incoming mail. *Id.* The district court in that case denied relief with respect to mail the inmate had received from federal courts because although *Sallier* "held that such mail could enjoy constitutional protection, the lack of proper labeling" consistent with the prison's policies meant that the inmate could not claim protection for those envelopes. *Id.* at 311. The inmate did not appeal that aspect of the district court's decision. *Id.* at 312.

How legal mail must be identified and marked is thus a question best addressed not by *Sallier*, but by the Supreme Court's decision in *Wolff*. The primary question in *Wolff* asked whether prisons are constitutionally required to deliver legal mail to

inmates unopened. *See* 418 U.S. at 575. The Court held that they are not. Prisons, it held, may open "letters determined or found to be from attorneys" as long as the letters are opened in the presence of the intended recipient. *Id.* at 575–77. The "possibility that contraband will be enclosed in letters, even those from apparent attorneys," justified a policy of opening those letters. *Id.* at 577.

That was not all *Wolff* held, however. As is relevant here, *Wolff* also held that prisons may require parties to register and to identify themselves before sending mail to inmates. Identity verification is appropriate, the Supreme Court wrote, to "assure that … letters marked privileged are actually from members of the bar." *Id.* at 5777. Among other things, *Wolff* held that prisons may require an attorney to register with prison officials before sending legal mail to an inmate. *Id.* at 576–77. As part of that registration and identification process, *Wolff* held that prisons may require communications from an attorney to be "specially marked." *Id.* at 576. And while *Wolff* specifically discussed certain types of markings, such as an attorney's name and address, it did not hold that those markings were the *only* type of identification that prison officials could require. *See id.* 576–77. *Wolff*'s requirement makes sense. "No legal mail is sacrosanct" and "[p]rison officials cannot be certain, just from the return address on an envelope, that a letter is from a lawyer (or indeed from a court or

agency) rather than from a criminal confederate of the prisoner masquerading as a lawyer." *Guajardo-Palma v. Martinson*, 622 F.3d 801, 804 (7th Cir. 2010).

The Department's legal-mail policy involves little more than an application of *Wolff*'s registration and identification requirements. As *Wolff* contemplated, the legal-mail policy requires anyone who wishes to send confidential legal mail to an inmate to register with prison officials in advance. R.44-6, Buchanan Affidavit ¶11.a.i, PageID#296. *Wolff* held an attorney may be required to "*first* identify himself and his client to prison officials," before corresponding with an inmate. *Wolff*, 418 U.S. at 5777. The Department's legal-mail policy requires just that. The legal-mail policy's control-number requirement is equally justified by *Wolff*. *Wolff* held that prisons may require that legal communications be "specially marked." *Id.* at 576. No one can dispute that a control number is a special marking—even if it is different from the specific types of markings that *Wolff* discussed.

The legal-mail policy also ameliorates some of the concerns that made court-sent mail such a "difficult question" in *Sallier*. *See* 343 F.3d at 876. The Court in that case recognized that not all court-sent mail will "involve a currently pending legal matter affecting [a] prisoner's rights" and that "even mail from a legal source," like a court, "may have little or nothing" to do with an inmate's legal-mail-related rights. *Id.* at 876, 874. The Court defined legal mail broadly anyway. It did so *not* because

30

all court-sent mail necessarily affects implicates inmates rights, but because it believed a broad definition was needed to avoid chilling the rights that do exist. *See id.* at 876–77. *Sallier* was intentionally overinclusive, in other words, because it believed it necessary to treat *all* court-sent mail prophylactically as legal mail. *See id.*

The Department's legal-mail policy makes such prophylactic treatment unnecessary. It allows prisons to distinguish between correspondence that must remain confidential and correspondence that contains already-public information. As the evidence in the record shows, that is what is happening. The evidence before the district court confirmed that Ohio courts have been adhering to the Department's legal-mail policy when appropriate. R.47, Wittrup Depo., PageID#388–89, 397, 399–400. But that does not mean that they are applying a control number to *every* piece of mail that they send an inmate. Publicly available information that is reflected on a state-court's docket, for example, is not confidential—and does not require a control number. *See State v. Lockhart*, 2025-Ohio-5440, ¶10 (Ohio Ct. App. 2025); *see also Martin v. Brewer*, 830 F.2d 76, 78 (7th Cir. 1987) ("[W]ith minute and irrelevant exceptions all correspondence from a court to a litigant is a public document."). The control-number requirement makes it possible to distinguish between publicly available information and correspondence that must remain confidential.

### C. The Department's legal-mail policy satisfies *Turner*'s four-part balancing test.

Even if *Sallier* does not preclude the Department's legal-mail policy (and even assuming that Quinn made the showing that *Stanley* requires), that policy must still satisfy the four-part test the Supreme Court established in *Turner*. It is not enough to rely on *Sallier* for that purpose. *Sallier* did not apply, or even discuss, that test; it cited *Turner* only once, in passing. *See Sallier*, 343 F.3d at 877. The Court must therefore apply *Turner* in the first instance. And *Turner* makes clear that the Department's legal-mail policy easily survives constitutional scrutiny.

It is by now a "familiar proposition that 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)) (alteration accepted). That does not mean that inmates give up all their constitutional rights; "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. To aid courts in balancing the rights of inmates against a prison's legitimate penological interests, the Supreme Court in *Turner* "laid out four factors relevant in determining the reasonableness of a prison regulation." *Bethel v. Jenkins*, 988 F.3d 931, 939 (6th Cir. 2021) (quotation marks omitted; alteration accepted). Those factors include: "(1) whether there is a 'valid

rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;' (2) 'whether there are alternative means of exercising the right that remain open to prison inmates;' (3) 'the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;' and (4) 'the absence of ready alternatives' to the regulation for prison officials." *Id.* (quoting *Turner*, 482 U.S. at 89–90). Finally, a regulation must be applied "in a neutral fashion, without regard to the content of the expression." *Turner*, 482 U.S. at 90.

It is only if a policy satisfies the first *Turner* factor that courts consider the remaining three factors. *See Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994). When balancing those factors, courts must not substitute their judgment for the judgment of prison officials; "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment" about whether a policy is appropriate. *See Pell*, 417 U.S. at 827.

All four *Turner* factors support the Department's legal-mail policy here.

*Governmental interest. Turner* requires that a there be a "valid, rational connection" between a prison regulation and the governmental interest justifying it. *Turner*, 482 U.S. at 89. A perfect fit is not required, but it must not be "so remote

33

as to render the policy arbitrary or irrational." *Id.* at 89–90. When considering whether a policy is justified, courts must give prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). The need for deference is particularly compelling when it comes to "internal security within" prisons. *See Pell*, 417 U.S. at 823. Internal security is a "legitimate penal objective" that is "central to all other corrections goals. *Id.* It is also a difficult problem that is not "susceptible of easy solutions." *See Bell*, 441 U.S. at 547.

Although he has since changed his tune, Quinn conceded below that the Department's legal-mail policy satisfies *Turner*'s first step. R.46, Quinn Opp. to MSJ, PageID#366 (agreeing that *Turner*'s "first criterion has been met"). For good reason. Incoming mail has always posed a significant security challenge. As the Supreme Court recognized in *Wolff*, there is a "possibility that contraband will be enclosed in letters, even those from apparent attorneys." 418 U.S. at 577. As a general matter, *any* type of contraband "creates additional problems because scarce items, including currency, have value in a jail's culture and underground economy." *Florence*, 566 U.S. at 333. But the harm posed by the type of drug-soaked paper contraband that prisons are now encountering in the mail has been especially well

documented—and is increasing. R.44-1, Kucinic Affidavit ¶9, PageID#270–71; R.44-6, Buchanan Affidavit ¶8, PageID#296; R.47, Wittrup Depo., PageID#404; *see also* Bischoff, *Smuggled Drugs Fuel Chaos Inside Ohio Prisons*, Columbus Dispatch, https://perma.cc/3FHF-LUJK.

The Department's legal-mail policy is rationally related to combating that harm. Before implementing its control-number requirement, the Department encountered contraband disguised as legal mail nearly every day. R.47, Wittrup Depo., PageID#379, 395. Inmates were aware that it was easier to smuggle in contraband if it looked like it came from an attorney or a court; at least twice the Department intercepted mail from inmates that contained instructions about how to use fake legal documents to smuggle drugs into prison. R-44-2, Kucinic Affidavit, Ex.1, PageID#283, 285.

Ohio's experience is not unique. Other States have faced similar problems in dealing with counterfeit legal mail. The problem posed by fake legal mail is one reason why federal courts in Kentucky have "routinely upheld" prison policies that combat mail-based contraband by opening and copying legal mail in front of an inmate. *See Johnson v. Briarly*, No. 3:22-cv-00153-JHM, 2023 WL 4747688, *2 (W.D.Ky. July 25, 2023) (collecting cases).

Most relevant here, the Third Circuit has blessed the Pennsylvania control-number policy that inspired the Department's own legal-mail policy. *See Fontroy v. Beard*, 559 F.3d 173 (3d Cir. 2009); *see also* R.47, Wittrup Depo., PageID#383. The Third Circuit in that case recognized that a control-number requirement is rationally related to concerns about the "falsification of return addresses in order to obtain treatment as" legal mail. *Fontroy*, 559 F.3d at 178. It also held that it is rational to apply a control-number policy to mail sent by attorneys *and* courts. "If court mail policies did not change along with attorney mail polices," the Third Circuit held, "it is obvious that abuse of the legal mail system could continue with ease: to circumvent the new attorney mail policy, individuals could simply forge a court's return address on the envelope instead of an attorney's." *Id.* at 179. The same is true here. It is no more difficult to forge a court's return address in Ohio than it was in Pennsylvania.

The Third Circuit's decision was consistent with decisions from the Seventh and Ninth Circuits. The Seventh Circuit observed that a prison policy that required incoming mail to be treated as regular mail unless the envelope was specifically marked "Special Mail – Open only in the presence of the inmate" did not interfere with an inmate's legal mail rights because "courts should be able without difficulty to learn to affix the required legend," and because "with minute and irrelevant exceptions

all correspondence from a court to a litigant is a public document, which prison personnel could if they want inspect in the court's files." *Martin*, 830 F.2d at 77–78. And although the Seventh Circuit later characterized *Martin*'s observation as *dicta*, *Castillo v. Cook Cnty. Mail Room Dep't*, 990 F.2d 304, 306 (7th Cir. 1993), that did not stop the Ninth Circuit from favorably citing it when upholding a requirement that incoming mail be treated as confidential only if it is specifically marked as "legal mail," *see Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996); *but see Sallier*, 343 F.3d at 876–77 (distinguishing *Martin* and *Keenan*).

*Alternative means of exercising rights*. Under *Turner*'s second factor, courts should be "particularly conscious" of the "judicial deference owed to corrections officials" when "other avenues remain available for the exercise of [an] asserted right." *Turner*, 482 U.S. at 90 (quotations omitted). When considering whether such alternatives exist, the right "in question must be viewed sensibly and expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989). It should not be defined so narrowly as to preclude meaningful alternatives. *Turner*, for example, upheld a restriction on correspondence between inmates in different prisons in part because inmates possessed "other means of expression," not because they had "other means of communicating with inmates at other institutions." *Id.* at 417–18.

37

Construed broadly, the right at issue here is best defined not as a right to have all court-sent mail treated as confidential mail, but as a right to access the courts and receive legal mail more generally. Viewed through that lens, the district court was right to conclude that inmates may exercise their rights by encouraging courts to "obtain and affix" control numbers to mail where appropriate. *See* R.50, Order, PageID#440. The evidence shows that state courts are applying control numbers where appropriate. *See* R.47, Wittrup Depo., PageID#388–89, 397, 399–400; *see also Lockhart*, 2025-Ohio-5440 at ¶10 (declining to apply control number to public documents because such numbers are "for use when sending confidential legal mail"). Alternative means for accommodating inmates' legal-mail rights therefore remain available even though inmates cannot require courts to use control numbers. *See* R.50, Order, PageID#440–41.

To be sure, the Department's legal-mail policy functions more smoothly when applied to attorneys, as compared to courts. As the Third Circuit noted when upholding Pennsylvania's similar control-number policy, there are certain problems in applying a control-number requirement to courts that make such a requirement a "less-than-ideal means of accommodating" inmates' rights. *See Fontroy*, 559 F.3d at 180. The district court acknowledged as much in this case as well. *See* R.50, Order, PageID#440–41 (quoting *Fontroy*). But the fact that an alternative means of

38

asserting a right does not provide a perfect substitute is irrelevant. Alternatives "need not be ideal"; "they need only be available." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

Finally, even if *no* alternatives exist, that "would not be conclusive" of Quinn's claims. *Id.* The lack of available alternatives is merely "some evidence that [a policy is] unreasonable." *Id.* In this case, that evidence would be outweighed by the evidence supporting the Department's legal-mail policy. The undisputed testimony about the smuggling of drugs into prisons disguised as legal mail is more than enough to demonstrate that the Department's legal-mail policy is reasonable—even if inmates had no other means of receiving confidential mail from courts. *See* R.44-1, Kucinic Affidavit ¶9, PageID#270–71; R.44-6, Buchanan Affidavit ¶8, PageID#296; R.47, Wittrup Depo., PageID#379, 395, 404.

*Impact on guards and other inmates.* The third *Turner* factor requires courts to consider the impact that accommodating an asserted right "will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Under that factor, courts again must be "particularly deferential" to prison officials when accommodation of an asserted right will have "a significant 'ripple effect' on fellow inmates or on prison staff. *See Turner*, 482 U.S. at 90.

Here, there can be no doubt that accommodating Quinn's asserted right in the way he suggests would have significant ripple effects. As the evidence in this case shows, the Department's legal-mail policy has significantly "curtailed the convenance of drug contraband into [the Department's] institutions." R.50, Order, PageID#441. The amount of contraband disguised as legal mail dropped precipitously after the Department revised its legal-mail policy. R.47, Wittrup Depo., PageID#379, 395.

Even if contraband never reaches beyond its intended recipient, that would be enough. "The use of drugs can embolden inmates in aggression toward officers or each other." *Florence*, 566 U.S. at 332. But contraband is rarely confined to a single inmate. "[E]ven apart" from the *use* of illicit contraband such as drugs, "the trade in these substances can lead to violent confrontations." *Id.* "Once in the prison," contraband "may be expected to circulate among prisoners." *Thornburgh*, 490 U.S. at 412. That is certainly true here. The evidence in this case showed that there is a thriving black market for the type of contraband the Department's policy is designed to combat. As of 2024, a single sheet of drug-soaked paper was worth $4,500 on average. R. 44-1, Kucinic Affidavit ¶9, PageID#270–71.

Quinn's proposed accommodation would also "cause a significant reallocation of the prison system's financial resources." *Overton*, 539 U.S. at 135. The legal-mail

policy at issue here has had numerous benefits beyond just restricting the flow of contraband into prisons. The Department has benefited financially and operationally by being able to better allocate its staff. R.44-6, Buchanan Affidavit ¶12, PageID#297. Inmates have benefited as well. Under the new policy, the Department has improved mail delivery efficiency and reduced costs for families and friends of inmates. *Id.* Reverting to the Department's old legal-mail policy would undo all these benefits.

*Absence of alternatives for prison officials. Turner*'s fourth and final factor asks whether there are "obvious, easy alternatives" to a challenged policy. *Turner*, 482 U.S. at 90. The "absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* Significantly, this is "not a 'least restrictive alternative' test." *Id.*; *see also Thornburgh*, 490 U.S. at 411. "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating [a] claimant's constitutional complaint." *Turner*, 482 U.S. at 90–91.

This factor clearly favors the Department. There are no alternatives to the Department's policy at all, let alone "easy" ones. The only alternative that Quinn offers is a return to the old legal-mail policy; he suggests that the Department should "simply exempt all courts from the control-number policy." Quinn Br., Doc.16 at 52. But the flaws in the Department's old policy are well documented. As the

district court held, the "undisputed evidence confirms that the [new] Policy was implemented in part to deter unidentified third parties from sending to inmates contraband disguised as legal mail." R.50, Order, PageID#442. Before the Department adopted the new policy, that mail was often disguised as mail from courts. *See* R.44-1, Kucinic Affidavit ¶7.a–c, PageID#270; R.44-2, Kucinic Affidavit Ex.1, PageID#289. Returning to the old policy would therefore also mean a return to the problems that it caused. Quinn's inability to identify any legitimate alternative to the policy he challenges confirms that the Department's new legal-mail policy is reasonable. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Tuner*, 482 U.S. at 90. That is especially true where, as here, there are *no* alternatives—ready or otherwise.

### D. Department officials are entitled to qualified immunity.

Public officials are eligible for qualified immunity "if (1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016). To be clearly established "[T]he contours of [a] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Quinn's claimed First Amendment right was not. Even the district courts in Ohio

have been unable to agree on whether the Department's legal-mail policy violates prisoners' rights. *See Straughter v. Eddy*, No. 2:23-cv-1268, 2023 WL 6290069, *4 (S.D. Ohio Sept. 27, 2023) (discussing conflicting decisions). So even if the Court concludes that the Department's legal-mail policy violates Quinn's rights, it should nevertheless hold that that the Department officials named in Quinn's complaint are entitled to qualified immunity.

The district court denied the Department's Motion for Summary Judgment with respect to qualified immunity because it determined that *Sallier* clearly established a right for inmates to be present when mail sent to them by a court is opened. *See* R.50, Order, PageID#434. But, as discussed above, *Stanley* limited the scope of that decision. *See* 23–27. At the very least, *Stanley* shows that there is uncertainty about the scope of the right Quinn claims to find in *Sallier*.

Even if *Stanley* had not limited *Sallier*, that decision still would not resolve the question at issue here, which asks: What qualifies as mail from a court? Because *Sallier* did not answer that question, and because it did not apply the *Turner* factors, the "unlawfulness" of the Department's legal-mail policy was not "apparent" to Department officials. *See Anderson*, 483 U.S. at 640. That is especially true in light of the fact that the only circuit court to have addressed a policy similar to the one the Department adopted had upheld it. *See Fontroy*, 559 F.3d at 182. Even assuming

that "a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals," *Taylor v. Barkes*, 575 U.S. 822, 826 (2015) (*per curiam*), no right was clearly established here.

## II. Neither Quinn, nor any of his *amici*, provide a compelling reason why the Court should reverse the district court's judgment.

Quinn and his *amici* make a handful of arguments about why the Court should reverse. They rely on *Sallier*, which is not dispositive for the reasons discussed above. *See* 23–31. But beyond that, their arguments are few. Quinn points to the recently adopted exception for federal-court mail, for example, and claims that it shows that the Department's legal-mail policy is irrational. But that exception does not change the fact that the Department's policy is rationally related to its interest in combating mail-based contraband. Quinn also does not offer any feasible alternatives to the Department's legal-mail policy, and he does not provide any compelling reason to distinguish the Third Circuit's decision in *Fontroy*. As for Quinn's *amici*, they highlight problems with prison mail that inmates other than Quinn have experienced. Even taken as true, those problems are not enough to justify systemic relief. And they cannot establish why, as Circuit precedent requires, *Quinn* was prejudiced by the alleged mishandling of *his* mail. Finally, to the extent that Quinn and his *amici* imply that the only way to ensure that inmates receive complete documents from

courts is to treat all court-sent mail as legal mail, they are wrong. There is no page limit that applies to such mail.

### A. The Department's legal-mail policy is not undermined by the fact that it excuses federal courts from the control-number requirement.

One of Quinn's primary arguments for reversal is that the Department's legal-mail policy is irrational because it requires state courts to obtain a control number before sending confidential mail to an inmate but no longer requires *federal* courts to do the same. *See* Quinn Br., Doc.16 at 38–43. The Department, Quinn claims, has "put forward *no* persuasive reason to treat federal courts, but not state courts, as exempt from the policy." Quinn Br., Doc.16 at 24. Quinn is wrong. The Department *has* provided reasons for excluding federal, but not state, courts.

Those reasons are rational ones. In the words of Brian Wittrup, the Department's Chief of Strategy and Policy, the Department did not excuse state courts from complying with the control-number requirement because "any chink in [the] armor is going to get contraband through." R.47, Wittrup Depo., PageID#402. And when one vulnerability is addressed, smugglers will simply look for another one. *Id.* The Department therefore "narrowly tailor[ed]" the federal-court exception because "the wider you make exceptions to a policy the more trucks can drive through it." *Id.* at 407–08. There was also no need to create an exception for mail sent by

state courts. Unlike federal courts, the evidence showed that state courts were using control numbers when appropriate. R.47, Wittrup Depo., PageID#388–89, 397, 399–400. If the policy was working, there was no need to change it.

Evidence aside, there was also a relevant legal consideration: federal courts have refused to comply with the Department's policy and the Department cannot force them to do otherwise. At least one federal court wrote that it objected to the policy in part because the Department has no power to "interfere with a federal court's ability to communicate with a litigant by insisting, *inter alia*, that a 'control number' be applied to the envelope." *Brown v. Annette Chambers-Smith*, No. 2:22-cv-2469, 2022 U.S. Dist. LEXIS 186172, *3–4 (S.D. Ohio Oct. 11, 2022). While the Department objects to such characterization of its policy, it is indeed true that States cannot dictate the internal operations of federal courts. *Cf. Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 901 (6th Cir. 2001) ("[I]n federal court, federal procedural rules must be applied even if they differ from otherwise applicable state rules."). The decision to exempt federal courts from the control-number requirement was rational; it makes little sense to maintain a policy that cannot be enforced.

Quinn is also wrong when he argues that the Department has taken "inconsistent litigation positions" with respect to court-sent mail and that judicial estoppel therefore applies in this case. *See* Quinn Br., Doc.16 at 42–43. "The doctrine of judicial

46

estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Teledyne Industries, Inc. v. NLRB*, 911 F.2d 1214, 1217 (6th Cir. 1990) (quotation omitted). It is designed to "preserve[] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Id.* at 1218.

Judicial estoppel does not apply here. The Department has not engaged in "gamesmanship" and it has not taken conflicting positions. It has consistently maintained that it has an interest in combating contraband masquerading as legal mail. *See El-Barseem K. Allah v. Annette Chambers-Smith*, 2:22-cv-21 (S.D. Ohio), R.91, Stipulated Order, PageID#665 (noting that the Department's "legal mail practice" is driven by concerns about "sensitivity and security" of its institutions and "the need in preventing contraband from entering institutions"). The fact that the Department has agreed to exempt mail sent by federal courts from the requirement that senders of legal mail obtain and apply a control number does not lessen that interest. The stipulated order *Allah* in fact confirms the Department's interest. As part of the agreement, "the federal courts and their clerks" agreed to advise Department officials on "how to identify mail truly sent from federal courts." *Id.* They provided, in other words, an alternative way for the Department to pursue its legitimate interests.

### B. Neither Quinn nor his amici provide any feasible alternatives to the Department's legal-mail policy.

As noted above, Quinn does not offer any meaningful alternatives to the Department's legal-mail policy. *See* 41–42. His only suggestion is that the Department return to the prior legal-mail policy, a policy that was undisputably ineffective in combating mail-based contraband. R.47, Wittrup Depo., PageID#379, 395. Quinn has therefore forfeited any argument about other possible alternatives.

Among them, Quinn failed to offer, as a possible alternative, that the Department photocopy all incoming mail from courts, rather than require control numbers. Because "contraband continued to pop up in legal mail even after the institution of the control-number system," *Ohio Just. & Policy Ctr. v Chambers-Smith*, No. 1:25-cv-291, 2026 WL 369374, *22 (S.D. Ohio Feb. 10, 2026), the Department now copies all legal mail in an inmate's presence and gives the inmate the copies before shredding the original, *see* Incarcerated Population Legal Mail, 75-MAL-03, VI.A.6 (2025). The Department adopted that practice in 2025, well before Quinn filed his brief. *See id.* (adopted Sept. 23, 2025); Quinn Br., Doc.16 (filed on March 17, 2026).

Even if Quinn had preserved the argument, photocopying alone is not an adequate substitute for the Department's more comprehensive legal-mail policy. While photocopying legal mail might address some of the issues surrounding certain types of contraband, it does not adequately address the Department's interest in ensuring

the security of its institutions.  The Department's interest is not limited to specific types of contraband.  It has a broad interest in combating the misidentification of mail more generally.  Prison officials cannot read mail that is improperly identified as legal mail, *see* R.47, Wittrup Depo., PageID#391, and so have no way of knowing whether such mail contains impermissible communications.  This is not an idle concern.  Before the Department imposed the control-number requirement, numerous people falsely registered as attorneys.  *See* R.44-6, Buchanan Affidavit ¶12.b, PageID#297; *see also* R.44-1, Kucinic Affidavit ¶13, PageID#271.  Registration made them eligible for the more lenient treatment that attorneys receive when visiting or communicating with a client.  At any rate, in the prison-mail context, the First Amendment does not demand perfection, just reasonableness.  *Turner*, 482 U.S. at 89–90; *Overton*, 539 U.S. at 135.

Quinn's *amici* offer contradictory arguments about how the Department should handle court-sent mail that does not have a control number.  Some *amici* complain about the delays caused by the Department's new legal-mail policy and, like Quinn, argue that the Department should return to its old policy and treat all mail from courts as legal mail.  *See* Prisoners' Legal Services of New York Br., Doc.29 at 6; Human Rights Defense Center Br. Doc.32 at 31.  They also suggest, however, that the Department should return court-sent mail without a control number to the

49

sender, rather than treat it as regular mail.  *See* Prisoners' Legal Services of New York Br., Doc.29 at 21–22; *see also* Human Rights Defense Center Br., Doc.32 at 31. But adopting that alternative would increase the type of delays about which they have complained.

The alternatives are not the only thing about which Quinn's *amici* are confused. One of them, the Ohio Justice and Policy Center, also appears to be confused about the law that applies to prison mail.  The OJPC suggests that prison staff should ensure the legitimacy of purported legal mail by calling courts to "confirm that a piece of mail is coming from" that court.  *See* OJPC Br., Doc.21 at 6–7.  But the Supreme Court explicitly rejected a similar approach in *Wolff*.  It held that requiring prison officials to "go beyond the face of [an] envelope" and "check in each case whether a communication was from an attorney" would pose "a near impossible task of administration." *Wolff*, 418 U.S. at 575–76.

It is not just controlling precedent about which the OJPC appears to be confused. It also seems to be confused about its own arguments in this case and others.  The OJPC suggests that when the Department receives mail from a court without a control number, that the Department should conduct a "brief inspection of the contents for identifying features such as docket numbers."  OJPC Br., Doc.21 at 4.  But only a few pages after suggesting that prison officials briefly inspect an inmate's legal mail,

*see id.*, the OJPC argues that officials *cannot* inspect such mail and that the only things prison officials can look for are the signature and letterhead, *see id.* at 6. The OJPC has also taken a contrary position in other cases. It has sued the Department over the portion of its legal-mail policy that now requires prison officials to photocopy legal mail in an inmate's presence and asserted that even *inadvertent* review of legal-mail is impermissible. *See Ohio Just. & Policy Ctr.*, 2026 WL 369374 at \*1 (quoting OJPC as arguing that the act of copying mail "will naturally require [a] staff member to lay eyes on [a] document").

### C. Quinn does not persuasively distinguish the Third Circuit's decision in *Fontroy*.

It is not just the district court's decision below to which Quinn has no persuasive response. He provides no compelling reason why this Court should reach a different conclusion than the one the Third Circuit reached in *Fontroy*. Quinn attempts to distinguish that decision for two reasons, neither of which is persuasive.

Quinn first argues that the Pennsylvania policy differs from the Department's because Pennsylvania allows for hand delivery of legal mail. Quinn Br., Doc.16 at 46. That argument overlooks the fact that *Fontroy* noted that hand delivery was *not* a meaningful alternative for mail sent by a court. Delivery of most mail from courts, it wrote, "either cannot or will not be made … in person." *Fontroy*, 559 F.3d at 180. Because the opportunity for hand delivery was not relevant to the Third Circuit's

51

decision, it provides no basis to distinguish the legal-mail policy at issue in *Fontroy* from the policy at issue here. The district court correctly recognized as much. *See* R.50, Order, PageID#440–41 (quoting *Fontroy* ).

Quinn's second effort to distinguish *Fontroy* fares no better. He notes that the Pennsylvania policy at issue in that case required courts to obtain a single, unchanging, control number. Quinn Br., Doc.16, 45. But that difference is less significant than Quinn makes it out to be. Pennsylvania's legal-mail policy requires attorneys to obtain a primary control number that is unique to them, along with an additional secondary number that changes weekly. *See* Commonwealth of Pennsylvania, Request an Attorney Control Number for Sending Privileged Mail, https://perma.cc/HW2E-9G8F. Courts are excused from the secondary control number requirement. *See id.* But all that means is that Pennsylvania requires courts to apply just one, unchanging control number.

That exclusion also did not matter to the Third Circuit's decision—*Fontroy* never even mentioned it. *See, generally*, 559 F.3d 173. Nor does it matter here. Quinn's objection is not that control numbers in Ohio expire after 21 days. It is that courts are subject to the control number requirement in the first place. He argues that the problem with the Department's policy is that "each piece of mail must contain a unique control number." Quinn Br., Doc.16 at 47. But the same is true in

Pennsylvania. The only difference between the Pennsylvania and Ohio policies is whether the control number changes over time for courts.

### D. Isolated examples of problems with prison mail delivery do not show that the Department's legal-mail policy is facially unconstitutional and systemically invalid.

Quinn's Complaint asserted that prison officials violated his rights when, consistent with the Department's legal-mail policy, they opened mail sent to him by a court. R.1, Complaint, PageID#1–10. The sole focus of his complaint was the opening and reading of his mail. Quinn did not allege that his mail was subject to a five-page limit, that his mail was misdirected or delayed, or that he was prejudiced in any other way by the Department's mail policies. *See id.* And although Quinn move to amend his complaint a few months later, the only changes he proposed were to the identity of the defendants. R.15, Amended Complaint, PageID#99. The only question before the Court is therefore whether the Department violated Quinn's rights by opening mail sent to him by a court without a control number. And because the Department has amended its policy to excuse federal courts from the control-number requirement, that question is limited to whether the Department violated Quinn's rights by opening mail sent by *state* courts.

Quinn's *amici* do not focus on that question. They focus on the rights of *other* inmates and allege that those rights have been violated for reasons unrelated to the

allegations in Quinn's complaint. Relying in large part on an article written by The Marshall Project, *amici* cite examples of delayed or incomplete mail that, they say, were caused by the Department's broader mail policies. *See, e.g.*, Nat'l Ass'n of Criminal Defense Lawyers Br., Doc.28 at 6–7. But neither the Marshall Project article, nor *amici*'s reprise of it, justifies the relief that Quinn seeks. OJPC says that the Court must look at the Department's legal-mail policy "as part of a broader pattern" of policies. OJPC Br., Doc.21 at 11. But Quinn's complaint was not about those broader policies, or even about their implementation. It was about the control-number requirement and that requirement alone. *See* R.1, Complaint, PageID#9 (asking the district court to enjoin the "reading, copying and opening of legal documents" sent by courts, lawyers, and law firms).

As evidence of alleged problems in the Department's handling of mail, *amici* highlight cases in which they allege mail was mishandled. As a threshold matter, the events in several of those cases occurred in the early stages of the implementation of the Department's revised mail policies and at most reflect the type of one-off staff training issues that might be associated with any significant overhaul of established procedures. *See Swain v. Chambers-Smith*, No. 2:23-cv-2809 (S.D. Ohio), R.26, Am. Compl, PageID#163 (discussing events that occurred in 2021–23); *Bishop v. Forshey*, No. 2:25-cv-292 (S.D. Ohio), R.10, Compl. (discussing events that occurred in 2024

and 2025); *Kendrick v. Chambers*, No. 1:22-cv-170 (S.D. Ohio), R.32, 33, Supplemental Documents (discussing events in 2023).

Following *Stanley* and its prejudice requirement, it is questionable whether any systemic or facial challenge premised on access to courts can succeed. But putting that aside, the cases that the *amici* cite are not enough to sustain one here. A successful systemic challenge requires evidence of "widespread actual injury," not just a handful of "isolated instances." *Lewis*, 518 U.S. at 349; *see also Okoro v. Scibana*, 63 Fed. App'x 182, 184 (6th Cir. 2003) (A "random and isolated incident" of mis-delivered mail was "insufficient to establish a constitutional violation."); *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) ("Allegations of sporadic and short-term delays in receiving mail are insufficient to state a cause of action grounded upon the First Amendment."). A few examples of mishandled mail in a system that contains tens of thousands of inmates are not enough to show a system-wide problem. *Amici*'s arguments evoke a quip: the "plural of anecdote is not data." *Cf. United States v. Anthem, Inc.*, 855 F.3d 345, 380 (D.C. Cir. 2017) (Kavanaugh, J., dissenting). But anecdotes are all that *amici* offer. There is no evidence in this case of an "inadequacy widespread enough to justify systemwide relief[.]" *Lewis*, 518 U.S. at 359.

Many of the facts on which the *amici* rely are not even properly before the Court. The Human Rights Defense Center, for example, relies on unverified allegations in

the complaints filed by several different inmates.  But there is no evidence in the record of this case to support those allegations.  And while Quinn asserts that the Court can take judicial notice of filings in court proceedings, *see* Quinn Br., Doc.16 at 42 n.6, judicial notice is limited to facts that "can be accurately and readily determine from sources whose accuracy cannot reasonably be questioned,"  Fed.R.Evid. 201(b)(2).  That is why courts will take often judicial notice of the fact of a document's existence but not the "statements contained in the document for the truth of the matter asserted."  *See Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 894 F.3d 235, 245 (6th Cir. 2018) (quotation marks omitted).

There is a reason courts typically do not consider evidence outside the record.  It has not been "tested in the crucible of litigation."  *Cont'l Res., Inc. v. N.D. Bd. of Univ.*, 136 F.4th 778, 788 (8th Cir. 2025) (quotation marks omitted).  That is a particular concern here.  As evidence that inmates were punished for complaining about the handling of mail, for example, the Human Rights Defense Center cites an affidavit from Kimani Ware in which Ware claims that he was punished for complaining about the Department's mail policies.  Human Rights Defense Center Br., Doc.32 at 22 n.11.  But there is good reason to not to necessarily take Ware at his word.  The Ohio Supreme Court declared Ware a vexatious litigator in a separate case because Ware lied in his pleadings, "fabricated evidence," submitted a false affidavit, and

"perpetrat[ed] a fraud on [that] court." *State ex rel. Ware v. Vigluicci*, 177 Ohio St. 3d 381, 382, 384 (2024).

Even assuming that other inmates have experienced mail-delivery problems in the past, however, and even assuming that the Court may consider those problems here, the fact that other inmates may have been harmed by the Department's legal-mail policy does not mean that *Quinn* has been harmed. And in the absence of such harm, he has not asserted a valid First Amendment claim and is not entitled to relief. *See Stanley*, 602 F.3d at 770. Quinn cannot claim a violation of his rights simply because other inmates' mail was incomplete or delayed. *See Lewis*, 518 U.S. at 350.

### E. Mail inmates receive from courts is not subject to a five-page limit.

Quinn and his *amici* express concerns about whether the Department imposes a five-page limit on mail sent by courts that is processed as regular mail. Whatever the original merits of those concerns, they are now moot. The Department's policies arguably have never imposed a limit on court-sent mail. They have long excluded "photocopied material and material printed or downloaded from a computer" from the page limit that applies to regular mail when those copied materials included "[l]egal materials sent by an attorney or court." *See* Printed Materials Policy, 75-MAL-02, IV and VI.C.3 (2020). But even if the Department's policies may have been unclear at one point, they are no longer. As of December 15, 2025, the regular-

mail policy now makes unmistakably clear that court-sent mail is not subject to any page limits. It states that "court mail that is processed as regular mail per the legal mail definition shall not have a page limit requirement," and that "[a]ll copied pages shall be delivered to" an inmate. Incarcerated Population Mail, 75-MAL-01, VI.C.1.a (Dec. 15, 2025), available at https://perma.cc/M5Q6-G6JB.

## CONCLUSION

The Court should affirm the district court's decision.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record*
SAMUEL C. PETERSON
Deputy Solicitor General
MARCY A. VONDERWELL
JENNIFER A. DRISCOLL
Assistant Attorneys General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellees*
 *John/Jane Doe, et al.*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 12,894 words.  *See* Fed. R. App. P. 32(a)(7)(B)(ii).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, this brief was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

# DESIGNATION OF DISTRICT COURT RECORD

Appellees, pursuant to Sixth Circuit Rule 30(g), designate the following filings

from the District Court's electronic records:

*Quinn v. Doe*, 3:22-CV-00661

| Date Filed | R. No.; PageID# | Document Description |
| --- | --- | --- |
| 4/25/2022 | R.1; 1–10 | Complaint |
| 7/7/2022 | R.8; 62–64 | Motion to Dismiss |
| 7/29/2022 | R.15; 99 | Amended Complaint |
| 7/25/2023 | R.23; 136–39 | Memorandum Opinion and Order |
| 5/15/2024 | R.43; 237–43 | Motion for Summary Judgment |
| 5/16/2024 | R.44-1; 269–71 | Affidavit of Vinko Kucinic |
| 5/16/2024 | R.44-2; 278, 283, 285, 289 | Exhibit 1 to Affidavit of Vinko Kucinic |
| 5/16/2024 | R.44-5; 293 | Exhibit 4 to Affidavit of Vinko Kucinic |
| 5/16/2024 | R.44-6; 294–97 | Affidavit of Tim Buchanan |
| 5/16/2024 | R.44-8; 305 | Exhibit 2 to Affidavit of Tim Buchanan |
| 5/16/2024 | R.44-9; 317 | Exhibit 3 to Affidavit of Tim Buchanan |
| 5/16/2024 | R.44-11; 340–43 | Exhibit 5 to Affidavit of Tim Buchanan |
| 6/10/2024 | R.46; 366 | Opposition to Motion for Summary Judgment |
| 6/11/2024 | R.47; 378–79, 382–91, 395–408 | Deposition of Brian Wittrup |

| Date Filed | R. No.; PageID# | Document Description |
| --- | --- | --- |
| 2/26/2025 | R.50; 425–26, 434–443 | Order on Cross-Motions for Summary Judgment |
| 2/26/2025 | R.51; 444–45 | Judgment Entry |
| 9/29/2025 | R.58; 482–87 | Order on Plaintiff's Motion for Reconsideration |
| 10/21/2025 | R.59; 488–90 | Notice of Appeal |