No. 25-3845

IN THE

# United States Court of Appeals for the Sixth Circuit

JEREMY QUINN, JR.,

*Plaintiff-Appellant*,

v.

JOHN/JANE DOE, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Ohio
No. 3:22-cv-00661-DAC
Hon. Darrell A. Clay, U.S.M.J.

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

NEAL KUMAR KATYAL
JESSICA C. HUANG
  *Counsel of Record*
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7595
jhuang@milbank.com

June 8, 2026                         *Counsel for Plaintiff-Appellant*

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................3

I. Quinn's Challenge To The Control-Number Policy As It Applies To Federal Courts Is Not Moot ......................................................................3

II. *Sallier* Is Dispositive Here.............................................................................8

    A. *Wolff* And *Stanley* Are Inapposite...........................................................8

    B. *Sallier* Cannot Be Distinguished From This Case .............................13

III. The District Court's *Turner* Analysis Is Wrong..........................................16

    A. *Sallier* Applied *Turner* ......................................................................16

    B. Even If *Turner* Could Be Applied Anew, The District Court's Analysis Is Wrong ..............................................................................18

        1. Defendants Have Not Met Their Burden At *Turner* Step One ...............................................................................................19

        2. The Remaining *Turner* Factors Further Prove The Unreasonableness Of The Policy ................................................23

IV. Defendants Are Not Entitled To Qualified Immunity..................................26

CONCLUSION .....................................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Page(s)

CASES:

*ACLU Fund of Mich. v. Livingston County*,
796 F.3d 636 (6th Cir. 2015) ..............................................................3, 18, 19, 20

*Al-Amin v. Smith*,
511 F.3d 1317 (11th Cir. 2008) ...................................................................10, 18

*Ashford v. Raby*,
951 F.3d 798 (6th Cir. 2020) .............................................................................26

*Boswell v. Mayer*,
169 F.3d 384 (6th Cir. 1999) ..........................................................5, 10, 11, 12

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*,
532 U.S. 598 (2001)..............................................................................................4

*Cleavinger v. Saxner*,
474 U.S. 193 (1985)......................................................................................22, 23

*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ............................................................................9

*Ernold v. Davis*,
855 F.3d 715 (6th Cir. 2017) ...............................................................................4

*FBI v. Fikre*,
601 U.S. 234 (2024)...............................................................................1, 2, 5, 6

*Figel v. Overton*,
121 F. App'x 642 (6th Cir. 2005) .....................................................................19

*Flagner v. Wilkinson*,
241 F.3d 475 (6th Cir. 2001) .............................................................................20

*Huckaby v. Priest*,
636 F.3d 211 (6th Cir. 2011) ...............................................................................5

Page(s)

*J. Endres v. Ne. Ohio Med. Univ.*,
938 F.3d 281 (6th Cir. 2019) ......................................................................27

*Jones v. Brown*,
461 F.3d 353 (3d Cir. 2006) .......................................................................10

*Kensu v. Haigh*,
87 F.3d 172 (6th Cir. 1996) ........................................................................10

*Kent v. Oakland County*,
810 F.3d 384 (6th Cir. 2016) ....................................................................3, 26

*Lewis v. Casey*,
518 U.S. 343 (1996)....................................................................................10

*Martin v. Brewer*,
830 F.2d 76 (7th Cir. 1987) ........................................................................15

*McElhaney v. Elo*,
202 F.3d 269 (6th Cir. 2000) ......................................................................19

*Muhammad v. Pitcher*,
35 F.3d 1081 (6th Cir. 1994) ..................................................................10, 19

*Northland Fam. Plan. Clinic, Inc. v. Cox*,
487 F.3d 323 (6th Cir. 2007) .......................................................................7

*Parrish v. Johnson*,
800 F.2d 600 (6th Cir. 1986) ......................................................................19

*Pilgrim v. Littlefield*,
92 F.3d 413 (6th Cir. 1996) ........................................................................10

*Sallier v. Brooks*,
343 F.3d 868 (6th Cir. 2003) ......... 1, 2, 3, 8, 9, 10, 13, 14, 15, 16, 17, 18, 26, 27

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) .......................................................................7

*Stanley v. Vining*,
 602 F.3d 767 (6th Cir. 2010) ............................................................2, 9, 10, 11

*State ex rel. Feathers v. Pittman*,
 No. 24CA012120, 2025 WL 2438710
 (Ohio Ct. App. Aug. 25, 2025) ......................................................................23

*State v. Lockhart*,
 No. 25-CAA-07-0061, 2025 WL 3496507
 (Ohio Ct. App. Dec. 5, 2025)....................................................................23, 24

*Thornburgh v. Abbott*,
 490 U.S. 401 (1989).......................................................................................20

*Turner v. Safley*,
 482 U.S. 78 (1987)...................................... 16, 17, 18, 19, 23, 25, 26

*Whitney v. Brown*,
 882 F.2d 1068 (6th Cir. 1989) .................................................1, 16, 20, 21, 22, 24

*Wolff v. McDonnell*,
 418 U.S. 539 (1974).....................................................................................2, 8

**FILINGS:**

Mem. Op. & Order,
 Dkt. No. 55, *Brown-Austin v. Chambers-Smith*, No. 1:23-cv-478 (S.D.
 Ohio May 6, 2025)..........................................................................................23

Order Concerning Mail from this Ct.,
 Dkt. No. 12, *McFarland v. Williams*, No. 2:25-cv-1407 (S.D. Ohio Apr.
 28, 2026) .......................................................................................................6, 7

Order,
 Dkt. No. 23, *Picard v. DeWine*, No. 1:24-cv-2242 (N.D. Ohio June 10,
 2025) ...............................................................................................................27

Page(s)

Order,
   Dkt. No. 39, *Picard v. DeWine*, No. 1:24-cv-2242 (N.D. Ohio July 23,
   2025) ..................................................................................................24, 25

**REGULATIONS:**

OHIO ADMIN. CODE 5120-9-17(B)(1) ......................................................13

OHIO ADMIN. CODE 5120-9-17(B)(2) ...............................................6, 13

**OTHER AUTHORITIES:**

OHIO DEP'T OF REHAB. & CORR., *Incarcerated Population Legal Mail*, No.
   75-MAL-03 (Sep. 23, 2025), https://perma.cc/2HCF-WXHE ..............................6

OHIO DEP'T OF REHAB. & CORR., *Legal Mail*, https://perma.cc/YRQ9-T75G ..........6

**INTRODUCTION**

Defendants concede that court mail sent to ODRC-administered institutions is subject to the most severe of restrictions. That mail is thoroughly inspected using staff visual examination, drones, body scanners, chemical sniffers, and K9 units, and prisoners receive only copies instead of the original paper. But on top of that, when court mail lacks a control number, it is opened, read, and processed outside prisoners' presence. In other words, Defendants' control-number policy does precisely what *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003), forbade as an unconstitutional infringement of First Amendment rights. It treats legitimate court mail as "regular mail" simply because courts have declined to navigate a bureaucratic maze of ODRC's own making. "[P]rison officials do not set constitutional standards by fiat." *Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989). Such a policy cannot stand.

*First*, Defendants have abandoned any argument that the policy as applied to federal courts is constitutional. Instead, they contend only that this Court cannot reach the question because it has been mooted by a 2025 amendment to Policy No. 75-MAL-03. But Quinn seeks damages for *past* constitutional violations—a claim unaffected by subsequent policy change. And Defendants have not met their "formidable burden" to show their voluntary change is permanent, *FBI v. Fikre*, 601

1

U.S. 234, 241 (2024) (citation omitted), particularly where ODRC has repeatedly failed in practice to follow any purported policy change.

*Second*, on the merits, *Sallier* is dispositive. Defendants invoke *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Stanley v. Vining*, 602 F.3d 767 (6th Cir. 2010), but neither supports them. *Wolff* addressed whether attorney mail may be opened *in* a prisoner's presence—not whether court mail may be opened *outside* his presence. *Sallier* itself distinguished *Wolff* due to the serious problems that opening legal mail outside prisoners' presence raises, including the "possibility of tampering" and the "chill[ing]" effect such actions have on prisoners' First Amendment rights. 343 F.3d at 874. And *Stanley* addressed an access-to-the-courts claim requiring proof of prejudice—not the freestanding First Amendment claim that *Sallier* and its predecessors recognize. Finally, Defendants attempt (at 43) to distinguish *Sallier* itself by arguing that *this* case is about "[w]hat qualifies as mail from a court." Mail from a court qualifies as mail from a court. Defendants cannot evade *Sallier*'s holding by unilaterally redefining what qualifies as "court mail" and therefore the constitutional protections it is afforded. Such a position would render *Sallier* a nullity: any prison could avoid it by imposing bureaucratic requirements that courts refuse to follow, then treating the resulting non-compliant mail as regular mail.

*Third*, the District Court's *Turner* analysis is wrong. In addition to the reasons set forth in Quinn's opening brief, Defendants continue to put forward no convincing rejoinder to the fact that their "disregard" for their own "established" policy requiring *all* courts to obtain control numbers "give[s] rise to an inference of arbitrary or capricious action" that severely undermines their stated rationale for it. *ACLU Fund of Mich. v. Livingston County*, 796 F.3d 636, 646 (6th Cir. 2015) (citation modified). Nor could they: "it makes little sense to maintain a policy that cannot be enforced." Resp. Br. 46.

*Finally*, the District Court correctly denied qualified immunity. *Sallier* clearly established that court mail "constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise." 343 F.3d at 877. "Where Sixth Circuit law is clear, it controls." *Kent v. Oakland County*, 810 F.3d 384, 397 (6th Cir. 2016). Qualified immunity does not shield Defendants from liability for violating a right this Court recognized over two decades ago.

## ARGUMENT

### I. Quinn's Challenge To The Control-Number Policy As It Applies To Federal Courts Is Not Moot.

Defendants argue (at 22) that Quinn's challenge to the control-number policy as it applies to federal courts is now moot because of a 2025 amendment to Policy No. 75-MAL-03. But their argument fails for two independent reasons: (1) Quinn

seeks damages for past constitutional violations, and (2) Defendants have not met their burden to show their voluntary policy change is permanent.

Defendants first brush past the fact that Quinn seeks injunctive relief, declaratory relief, *and damages*. Compl., R.1, PageID#9. It is black-letter law that, "so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 608-609 (2001). Damages claims "are retrospective in nature" and seek relief for *past* constitutional violations. *Ernold v. Davis*, 855 F.3d 715, 719 (6th Cir. 2017) (citation omitted). So any *later* "change in [Defendants'] conduct will not moot the case." *Buckhannon*, 532 U.S. at 609.

Perhaps predicting this point, Defendants make a half-hearted attempt (at 22) at an argument they never raised before the District Court: that Quinn "is not entitled to backward-looking relief" because "Quinn did not allege that, prior to receiving [his mail], he requested that prison officials open all legal mail in his presence," nor did he "point to any evidence in the record that shows he made such a request." But as the District Court correctly recognized, "the facts contained in the record show Defendants' application of the Policy categorically excludes a specific and protected form of communication and *disregarded*" "*Quinn's explicit request to have his legal mail opened only in his presence*." Summ. J. Order, R.50, PageID#433 (emphasis added); Mem. Op. & Order, R.23, PageID#138 (emphasis added) (citing Ex. A-1 to

Compl., R.1-4, PageID#22). Quinn alleged that prison officials repeatedly opened his court mail "without [his] permission," attaching to his complaint exhibits of emails between him and ODRC staff where he expressly—on multiple occasions—made his request to have legal mail opened in his presence known to no avail. Compl., R.1, PageID#3-7; *see* Exs. A-1 to B-3 to Compl., R.1-4 to 1-8, PageID#22-26. And to the extent there is any ambiguity on this front, *pro se* "pleadings and filings" "enjoy the benefit of a liberal construction," *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999), and the facts contained in the record must be read in the light most favorable to Quinn, *see Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011).

Nor is Quinn's request for declaratory and injunctive relief moot. A defendant may not "automatically moot a case by the simple expedient of suspending its challenged conduct after it is sued." *Fikre*, 601 U.S. at 241 (citation modified). Instead, a defendant's "voluntary cessation of a challenged practice will moot a case *only* if [it] can show that the practice *cannot reasonably be expected to recur*." *Id.* (emphasis added) (citation modified). That is a "formidable burden." *Id.* (citation omitted). The reason: "The Constitution deals with substance, not strategies." *Id.* (citation modified). "Were the rule more forgiving, a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off; it might even repeat this cycle as necessary until it achieves all of its allegedly

5

unlawful ends." *Id.* (citation modified). "A live case or controversy cannot be so easily disguised, and a federal court's constitutional authority cannot be so readily manipulated." *Id.* "To show that a case is truly moot, a defendant must prove *no reasonable expectation remains* that it will return to its old ways. That much holds for governmental defendants no less than for private ones." *Id.* (emphasis added) (citation modified).

Defendants' attempt to argue mootness does not come close to meeting their "formidable burden" to show it, as it is not even clear that Defendants *have* suspended their conduct, let alone that their conduct "cannot reasonably be expected to recur." Defendants argue mootness by pointing to a 2025 amendment they made to Policy No. 75-MAL-03. OHIO DEP'T OF REHAB. & CORR*., Incarcerated Population Legal Mail* 2, No. 75-MAL-03 (Sep. 23, 2025), https://perma.cc/2HCF-WXHE. But the Ohio Administrative Code still states that mail from *any* court must be "marked with a valid control number" to be considered and treated as "[l]egal mail." OHIO ADMIN. CODE 5120-9-17(B)(2). ODRC's legal-mail webpage still reads as requiring *all* courts to register for and obtain control numbers, lest their mail be treated as regular mail. OHIO DEP'T OF REHAB. & CORR., *Legal Mail*, https://perma.cc/YRQ9-T75G. And multiple district courts have continued to reprimand ODRC for treating federal-court mail as regular mail even after *Allah* and *any* purported policy change. *See, e.g.*, Order Concerning Mail from this Ct. at 1,

Dkt. No. 12, *McFarland v. Williams*, No. 2:25-cv-1407 (S.D. Ohio Apr. 28, 2026) (ordering ODRC to "treat all mail sent from federal courts" "as legal mail" after it, on multiple recent occasions, "refused to deliver the Court's mail to Plaintiff because the mail did not include a control number").

On top of this, Defendants have not "affirmatively stated that [they] do[ ] not intend to reenact the" policy as applied to federal courts, and "[t]he timing of [Defendants'] change also raises suspicions that its cessation is not genuine." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019). Defendants "removed" federal courts from the policy only "after [Quinn's] complaint was filed. If anything, this increases [Defendants'] burden to prove that its change is genuine." *Id.*; *see also Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 342-343 (6th Cir. 2007) ("In this case, that burden is increased by the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed."). At most, Defendants' so-called policy change "is the same as any ad hoc regulatory action," which is given little to no "solicitude" in the mootness inquiry. *Schlissel*, 939 F.3d at 769. In the end, if this Court dismisses Quinn's complaint for mootness, nothing would prevent Defendants from reenacting the policy the very next day.

## II. *Sallier* Is Dispositive Here.

As even the District Court recognized, the control-number policy "does not square with the Sixth Circuit's express holding in *Sallier*." Summ. J. Order, R.50, PageID#434. Despite *Sallier*'s obvious relevance, Defendants attempt (at 27-28) to distinguish it, arguing that other cases like *Wolff* and *Stanley* are controlling instead, and that *Sallier* "asks a different question than the one at issue" here. No argument persuades.

### A. *Wolff* And *Stanley* Are Inapposite.

In *Wolff*, "[t]he *narrow* issue" "presented [was] whether letters determined or found to be from *attorneys* may be opened," but not read, "by prison authorities *in the presence of the inmate* or whether such mail must be delivered unopened if normal detection techniques fail to indicate contraband." 418 U.S. at 575 (emphasis added). The Court, as *Sallier* itself recognized, "uph[eld] such a policy against a Sixth Amendment attorney-client privilege claim and a Fourteenth Amendment due process claim based on access to the courts." 343 F.3d at 874 (citing *Wolff*, 418 U.S. at 577). That holding is well in line with this Court's caselaw. *See id.* at 877 (stating that this Court has "implied" in multiple cases that "a prison policy allowing inmates to be present when" legal mail is "opened [is] constitutionally required" "because of the potentially confidential nature of such correspondence").

Of course, whether a policy that allows for opening *attorney* mail *in the presence of the prisoner* is constitutional is worlds away from the question at issue here, and the one that *Sallier* addressed: whether a policy that allows "open[ing]" *court* mail *outside* "the presence of a prisoner who has specifically requested otherwise" violates the First Amendment. *Id.* "In order to guard against the possibility of a chilling effect on a prisoner's exercise of his or her First Amendment rights," *Sallier* clearly held that it does, and that holding controls here. *Id.*

Defendants attempt (at 29-30) to ascertain multiple other holdings from *Wolff* through a strained reading of cherry-picked statements. But the Supreme Court has long recognized that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821). Defendants may not extract broad legal rules from language divorced from the issues actually decided. *See id. Sallier*—not *Wolff*—is controlling.

*Stanley*—which did not even cite *Sallier*—is likewise inapposite and not the ringbearer of change Defendants attempt to make that case out to be; their reading of *Stanley* conflates two distinct constitutional claims and the requirements to prove both. In other words, there is no "tension" between *Stanley* and *Sallier* because they address *fundamentally different constitutional claims*. Resp. Br. 19. *Stanley* concerns whether the *pro se* prisoner there—who claimed a prison guard opened his

legal mail in his presence—had adequately alleged an "access to the courts" claim such that his complaint could pass the motion-to-dismiss stage. 602 F.3d at 770. And this Court and the Supreme Court have long held that "[i]n order to state a claim for denial of meaningful access to the courts," "plaintiffs must plead and prove prejudice stemming from the asserted violation," *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996), such as by alleging "that the incoming letter pertained to ongoing or anticipated litigation challenging either [their] sentence or the conditions of [their] confinement," *Boswell*, 169 F.3d at 387; *see Lewis v. Casey*, 518 U.S. 343, 351 (1996).

However, Quinn brings not an access-to-the-courts claim but a freestanding First Amendment claim based on his right to receive mail, as established by cases like *Muhammad v. Pitcher*, 35 F.3d 1081 (6th Cir. 1994), *Kensu v. Haigh*, 87 F.3d 172 (6th Cir. 1996), and, of course, *Sallier*. *See* 343 F.3d at 873-874 ("A prisoner's right to receive mail is protected by the First Amendment"; "a prison's security needs do not automatically trump a prisoner's First Amendment right to receive mail[.]"). This Court has never held—in *Stanley* or otherwise—that a freestanding First Amendment claim must meet the "prejudice" requirement elaborated on in *Lewis*.[1]

---

[1] Nor, to Quinn's knowledge, has any other court held that the prejudice requirement necessary for an access-to-courts claim adheres to a freestanding First Amendment claim. *See, e.g.*, *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006) (rejecting such an argument because "protection of an inmate's freedom to engage in protected

Indeed, the *pro se* prisoner in *Stanley* could *not* bring a freestanding First Amendment claim, as this Court recognized there that prisoners have "no First Amendment right that prevents a guard from opening [their] mail in [their] presence and reading it with an eye to determining if illegal conduct is afoot." 602 F.3d at 770. Because the prisoner could not bring a freestanding First Amendment claim, the prisoner could, at most, bring an access-to-the-courts claim. *See id.* But because he had not alleged, for instance, "injury or hind[rance to] his efforts to pursue a legal claim" that came from the opening of his legal mail in his presence, his claim could not proceed. *Id.* (citation modified).

What's more, this Court has made clear for decades that whatever prejudicial showing is required of an access-to-courts claim does not adhere to a freestanding First Amendment claim based on the right to receive mail. For example, in *Boswell*, a *pro se* prisoner alleged that prison officials had opened mail sent to him from the Michigan Attorney General's office outside his presence. 169 F.3d at 385. This Court had to determine whether the prisoner had standing to bring a claim he styled as one based on his "constitutional right to access to the court" and his "First Amendment rights of access to the court." *Id.* at 387. This Court held that, to the extent his complaint could be read as one bringing an access-to-the-courts claim, the

communications is a constitutional end in itself"); *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008) (same).

prisoner "appear[ed] to lack standing to bring such a claim" since he did not allege "prejudice to his right of access to the court." *Id.* But the Court separately held that "[a] sympathetic reading of [the plaintiff]'s filings produces the claim that the defendants violated his First Amendment right to receive mail, as propounded by this court in its decisions in *Kensu* and *Muhammad*." *Id.* at 388. And the Court held that, even without the showing of prejudice necessary for an access-to-courts claim, Boswell "ha[d] standing to bring a claim for a[ ]" "violation of his First Amendment right to receive mail." *Id.*

So too here. This case has always been about whether ODRC's policy as applied to courts violates Quinn's First Amendment right to receive legal mail as propounded by cases like *Sallier*. *See, e.g.*, Compl., R.1, PageID#7. The District Court and all parties below consistently treated this case as one about a violation of Quinn's First Amendment rights. *See, e.g.*, Summ. J. Order, R.50, PageID#435. This has never been an access-to-courts case. Defendants cannot now muddy the waters by attempting to treat it like one. Whatever prejudicial showing is required of an access-to-courts claim, as *Stanley* discussed, is irrelevant to Quinn's claim of violation of his First Amendment right to receive mail.[2]

---

[2] In any event, even if Quinn were bringing an access-to-courts claim, he would meet the harm requirement necessary, as the facts contained in the record show that Quinn's "incoming letter[s] pertained to ongoing or anticipated litigation challenging" "his sentence." *Boswell*, 169 F.3d at 387; *see, e.g.*, Ex. A-2 to Compl.,

### B. *Sallier* Cannot Be Distinguished From This Case.

Because *Stanley* and *Wolff* are inapposite, Defendants attack *Sallier* itself, attempting (at 27, 43) to sidestep that opinion by recharacterizing this case as presenting a "different question": "What qualifies as mail from a court?"

The answer is simple: mail from a court qualifies as mail from a court. Defendants describe (at 20) their policy as merely a "verification" mechanism. But whatever label Defendants attach to their policy, its practical operation is undisputed: legitimate court mail, so long as it does not bear a control number, is "*automatically* treated as regular mail, regardless of the return address on the envelope." Buchanan Aff., R.44-6, PageID#297 (emphasis added); *see* OHIO ADMIN. CODE 5120-9-17(B)(2). That means it is opened, read, and processed outside prisoners' presence even when prisoners have requested otherwise. Buchanan Aff., R.44-6, PageID#295; *see* OHIO ADMIN. CODE 5120-9-17(B)(1). That is not "verification." That is the precise constitutional violation that *Sallier* identified and prohibited. *See* 343 F.3d at 877. Indeed, Defendants' recent, so-called "clarif[ication]" to its policies, which states that "court mail *that is processed as regular mail* per the legal mail definition shall not have a page limit requirement," gives away the game. Resp. Br. 11, 58 (emphasis added). That "amendment[ ]" is

---

R.1-5, PageID#23 (stating that ODRC staff "copied" and "opened" Quinn's court mail "p[er]tain[ing] to [his] criminal case" "without [his] permission and outside [his] view" (citation modified)); Ex. B-1 to Compl., R.1-6, PageID#24 (same).

an admission that legitimate "court mail" "*is* processed as regular mail" under the control-number policy, not merely "verifi[ed]" and then treated appropriately. Resp. Br. 11, 20, 58 (emphasis added). And it recognizes that court mail, even without a control number, needs to be treated with special solicitude—just not the special solicitude *Sallier* requires—by exempting it from any page-limit requirement.

Moreover, Defendants' reframing assumes that prisons may strip court mail of its constitutional protections unless courts first satisfy administrative prerequisites that courts have no obligation—and often no willingness—to perform. *See* Opening Br. 43-44. But *Sallier* did not condition its holding on how *a prison* chooses to identify court mail. It held that court mail *is* legal mail, full stop, and that opening it outside prisoners' presence violates the First Amendment. 343 F.3d at 877. ODRC cannot circumvent that holding simply by redefining "legal mail" to exclude court mail lacking a bureaucratic marking. If it could, *Sallier*'s holding would be rendered a nullity: any prison could avoid it by imposing verification requirements that courts refuse to follow, then treating the resulting non-compliant mail as regular mail. That is exactly what is happening here and is exactly what *Sallier* forbids. Indeed, it is telling that the only Sixth Circuit precedent Defendants can muster up for their position that prison officials can simply redefine what "court mail" is—and therefore its constitutional protections—is an unappealed, nonbinding district-court

14

opinion.  *See* Resp. Br. 28 (discussing an "aspect of the district court's decision" in *Merriweather v. Zamora* that was not "appeal[ed]").

In fact, *Sallier* already expressly *rejected* the argument Defendants make here that court mail can be stripped of constitutional protection merely because it lacks a bureaucratic marking.  Defendants cite (at 36-37) *Martin v. Brewer*, 830 F.2d 76 (7th Cir. 1987), in support of their position, but elide the fact that *Sallier* explicitly declined to follow *Martin*'s holding.  This Court in *Sallier* "recognize[d] that the Seventh Circuit has stated in dicta that mail from court personnel can be treated as general correspondence unless it is designated according to prison policy as 'Special Mail—Open only in the presence of the inmate.'"  343 F.3d at 876 (citing *Martin*, 830 F.2d at 78-79).  But it "expressed disagreement with *Martin*'s rationale" and also expressly rejected the holding of an unpublished 6th Circuit opinion from 1993 which similarly held that it was "constitutional[]" to "apply[] to court mail the presumption that all incoming mail can be opened [outside prisoners' presence] unless it is marked with 'Special Mail—Open only in the presence of the inmate.'" *Id.* at 877, 879.

In the end, then, the operative constitutional question in this case is the same one *Sallier* answered: whether prison officials may open court mail outside prisoners' presence when prisoners have specifically requested otherwise.  *Sallier* held that they may not, because there is "*no* penological interest or security concern

15

that justifies" it. *Id.* at 877 (emphasis added). Defendants' policy produces exactly the result *Sallier* forbids. The fact that it does so through a "verification" mechanism rather than, say, an outright refusal to treat court mail as legal mail does not change the constitutional analysis. The First Amendment is concerned with what prison officials *do* with court mail, not with the administrative apparatus they construct to justify doing it. "[P]rison officials do not set constitutional standards by fiat." *Whitney*, 882 F.2d at 1074.[3]

## III. The District Court's *Turner* Analysis Is Wrong.

### A. *Sallier* Applied *Turner*.

Defendants do not contest that, if *Sallier* indeed applied *Turner* to hold that there is "no legitimate penological interest" in opening and reading court mail outside prisoners' presence when they have requested otherwise, then what the District Court did here by holding that there *is* a legitimate penological interest in doing so cannot stand. 343 F.3d at 877 (citing *Turner v. Safley*, 482 U.S. 78, 107

---

[3] At times, Defendants seem to suggest that *Sallier*'s protections apply only to court mail that is not a matter of public record. *See, e.g.*, Resp. Br. 31. But *Sallier* explicitly rejected that line—"express[ing] disagreement with" Seventh Circuit "dicta" that denied protection to court mail because it is "generally a matter of public record"—and held that *all* court mail "constitutes 'legal mail.'" 343 F.3d at 876-877. Defendants themselves otherwise acknowledge as much. *See, e.g.*, Resp. Br. 30-31 ("The Court [in *Sallier*] defined legal mail broadly" "because it believed it necessary to treat *all* court-sent mail" "as legal mail.").

(1987)); *see* Opening Br. 29-34.  Instead, they simply argue (at 32) that *Sallier* "did not apply, or even discuss" the *Turner* test.

But Defendants' argument makes no sense.  *Turner* establishes the exclusive framework for evaluating whether a prison regulation impinging on prisoners' constitutional rights passes muster.  *See* 482 U.S. at 89.  There is no alternative test, nor has there been since 1987—well before *Sallier* was decided.  A prison mail policy is either constitutional under *Turner* or not.  *Sallier* held that the policy at issue there was not, concluding that "[t]here is no penological interest or security concern that justifies opening" legal mail "outside of the prisoner's presence when the prisoner has specifically requested otherwise."  343 F.3d at 877-878; *see also id.* at 877 (citing *Turner* to conclude that "prison officials have no legitimate penological interest in reading" court correspondence with a prisoner).  A court could not reach that conclusion without applying *Turner*, because *Turner* is the only standard under which a First Amendment violation in the prison context can be found.

*Sallier*'s text confirms what logic requires.  *Sallier* expressly cited *Turner* to conclude that "prison officials have no legitimate penological interest in reading" court correspondence with a prisoner, thereby holding that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise."  *Id.*  The phrase "legitimate penological

17

interest[ ]" is *Turner*'s *own vocabulary*. 482 U.S. at 89. And *Sallier* described its analysis as "balanc[ing] the interest of prison security against the possibility of tampering that could unjustifiably chill the prisoner's right of access to the courts or impair the right to be represented by counsel." 343 F.3d at 874. That is the *Turner* balancing test in substance. Indeed, other circuits have even recognized that *Sallier* applied *Turner*. *See Al-Amin*, 511 F.3d at 1329-30 (noting that *Sallier* was "post-*Turner*" and that *Sallier* "articulated *Turner*'s reasonably related standard").

Because *Sallier* plainly applied the *Turner* test to conclude that there is "*no penological interest*" in a policy that justifies opening legal mail "outside of the prisoner's presence when the prisoner has specifically requested otherwise," the District Court may not override that binding holding to conclude otherwise. 343 F.3d at 877-878 (emphasis added).

**B. Even If *Turner* Could Be Applied Anew, The District Court's Analysis Is Wrong.**

Even if *Turner* could be applied anew, the District Court's analysis is wrong for all the reasons in Quinn's opening brief. Opening Br. 35-54. Defendants' response does not change that analysis; it strengthens it. Defendants have abandoned any argument that they have any "legitimate penological interest[ ]" in the policy as applied to federal courts. *Turner*, 482 U.S. at 89. In their own words, they actually have a legitimate interest *the other way*: "The decision to exempt federal courts from the control-number requirement was rational; it makes little sense to maintain a

policy that cannot be enforced."  Resp. Br. 46; *see also ACLU*, 796 F.3d at 646

("Disregard for established regulations relating to the delivery of legal mail give[s]

rise to an inference of arbitrary or capricious action." (citation modified)).  Because

Defendants have conceded the point, and the point is not moot, *see supra* pp. 3-7,

Quinn's challenge to the policy as applied to federal courts should automatically

prevail.  But even if Defendants had not conceded the point, and even as to state

courts, Quinn's challenge succeeds.

      **1.**        **Defendants Have Not Met Their Burden At *Turner* Step One.**

At the first step, it is *a prison's* burden to show that there is a "valid, rational

connection between the prison regulation and the legitimate governmental interest

put forward to justify it," and no deference is given to the judgment of corrections

authorities at this step.  *Turner*, 482 U.S. at 89 (citation modified); *see Muhammad*,

35 F.3d at 1085; *Figel v. Overton*, 121 F. App'x 642, 646 n.2 (6th Cir. 2005); *Parrish*

*v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986); *McElhaney v. Elo*, 202 F.3d 269, 269

(6th Cir. 2000) (Table).  Defendants are nowhere close to meeting that burden.

For one, Defendants sidestep the fact that an ODRC official confirmed that

ODRC has no evidence of, nor does it track, "how often" contraband is conveyed

through fake court mail, or even "how prevalent" that problem is, despite what may

be said about fake legal mail from *attorneys* and other legal organizations.  Wittrup

Dep., R.47, PageID#392-393.  Defendants misrepresent the record (at 8, 42) by

stating that there is a "well-documented history" of mail "often" disguised as court mail. A closer look at the record cites they provide show that there are only *three* documented examples of contraband disguised as fake court mail prior to implementation of the policy—contraband which, of course, was caught without the need for a control-number policy. *See* Kucinic Aff., R.44-1, PageID#270.

For another, Defendants continue to put forward no convincing retort to the fact that their "disregard" for their own "established" policy requiring *all* courts to obtain control numbers "give[s] rise to an inference of arbitrary or capricious action" that severely undermines their stated rationale for it. *ACLU*, 796 F.3d at 646 (citation modified). Defendants' only stated reason (at 45) for why federal-court mail does not pose a security risk but, somehow, state-court mail does, is that "any chink in [the] armor is going to get contraband through," and "the wider you make exceptions to a policy the more trucks can drive through it."

But this Court has rejected the notion that "anything prison officials can justify is valid because they have somehow justified it," and that "speculative" and "generalized" security concerns pass *Turner*'s test. *Flagner v. Wilkinson*, 241 F.3d 475, 487 (6th Cir. 2001) (citation modified); *Whitney*, 882 F.2d at 1074; *see also Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989) ("[T]he *Turner* standard" "is not toothless." (citation modified)). And "[p]erhaps the greatest weakness in the prison officials' arguments is their misunderstanding of *Turner*" "as holding that federal

20

courts will uphold prison policies which can somehow be supported with a flurry of disconnected and self-conflicting points." *Whitney*, 882 F.2d at 1074. In other words, the fact that Defendants see no "legitimate penological interest[ ]" in the control-number policy as applied to federal courts, but do as to state courts, reflects "their conclusory approach to the problem," and the arbitrariness of Defendants' approach can readily be analogized to a situation this Court faced in *Whitney*. *Id.*

In *Whitney*, this Court rejected a prison policy prohibiting Jewish prisoners from traveling between complexes for weekly Sabbath services, in large part because the officials' claimed security concerns at *Turner* step one were flatly contradicted by the prison's simultaneous practice of welcoming outside Jewish volunteers into those same secure areas: "the most glaring inconsistency in the prison officials' arguments, one which undermines their entire case, involves Jewish volunteers from Ann Arbor, Michigan." *Id.* at 1076. This Court "f[ound] it remarkable" that "prison officials prohibit intercomplex travel by" "Jewish inmates based upon security concerns," yet "simultaneously welcome [outside Jewish] volunteers" into the prison for Sabbath services. *Id.* After all, "[i]f prison officials are concerned about Jewish inmates' vulnerability to attack," that the Jewish prisoners' travel "raise[s] the possibility of smuggling contraband," and that such travel "causes many security headaches" "and the need for constant monitoring," then "surely the volunteers are equally vulnerable," "pose an equal danger," and "require the same" "in terms of

escorts, monitoring, and protection." *Id.* This Court "f[ound] it difficult to give much weight to complaints of the strain the Jewish inmates' travel" "allegedly places on the security staff when prison officials simultaneously tout the admission of community volunteers into the" prison. *Id.*

So too here. It is "remarkable" that Defendants maintain that the policy is necessary as applied to state courts "based upon security concerns" while "simultaneously" exempting federal courts from it. *Id.* "If prison officials are concerned" about contraband coming in from state-court mail, "surely [federal-court mail is] equally vulnerable." *Id.* If state-court mail "raise[s] the possibility of smuggling contraband," surely federal-court mail "entering the prison from outside pose[s] an equal danger." *Id.* ODRC argues that state-court mail "causes many security headaches," yet federal-court mail "surely" should cause "the same." *Id.* This Court should, as it did in *Whitney*, "find it difficult to give much weight to complaints of the strain" state-court mail "allegedly places on" security "when prison officials simultaneously" exempt federal-court mail from their policy. *Id.* Indeed, by Defendants' logic, *Whitney* was wrongly decided, as prisons could simply deny accommodation for some Jewish practitioners but not others through the justification that "any chink in [the] armor is going to get contraband through," and "the wider you make exceptions to a policy the more trucks can drive through it." Resp. Br. 45. But such "[r]outine and automatic arguments" that "every step taken

22

to protect constitutional rights of prisoners will lead to a breakdown in institutional" "security" "have been rejected by" this Court and the Supreme Court. *Cleavinger v. Saxner*, 474 U.S. 193, 207 (1985) (collecting cases).

### 2. The Remaining *Turner* Factors Further Prove The Unreasonableness Of The Policy.

Even if the Court reached the remaining *Turner* factors, none counsel in favor of Defendants. *See* Opening Br. 43-54.

*First*, why Defendants' policy does not pass *Turner* step two—whether there are "alternative means of exercising" their First Amendment right to legal mail "that remain open to prison inmates," 482 U.S. at 90—is best explained using Defendants' own words: both state and federal "courts have refused to comply with [ODRC]'s policy and [ODRC] cannot force them to do otherwise." Resp. Br. 46. ODRC "cannot dictate the internal operations of" any court. *Id.* And while prisoners may "encourage courts to apply control-numbers" to their mail, they cannot "force" them to do so. *Id.* at 18, 46.

In other words, prisoners are at the whim of whether the court they happen to have their case in decides to follow the arduous requirements of Defendants' control-number policy. State and federal courts alike have refused to do so. *See, e.g.*, Mem. Op. & Order at 4-5, Dkt. No. 55, *Brown-Austin v. Chambers-Smith*, No. 1:23-cv-478 (S.D. Ohio May 6, 2025); *State ex rel. Feathers v. Pittman*, No. 24CA012120, 2025 WL 2438710, at *5 (Ohio Ct. App. Aug. 25, 2025); *State v. Lockhart*, No. 25-

CAA-07-0061, 2025 WL 3496507, at *1 (Ohio Ct. App. Dec. 5, 2025); *see also* Wittrup Dep., R.47, PageID#388 (stating that ODRC has "no data" on "the percentage of state courts that comply with the policy and actually obtain control numbers"); Opening Br. 43-44, 47-48. And when a control number is not used, prisoners have no alternative means to exercise their First Amendment right under *Sallier* to have their court mail opened in their presence—it is "automatically treated as regular mail." Buchanan Aff., R.44-6, PageID#297.

*Second*, as to *Turner* step three, Defendants attempt to argue (at 40) that accommodation of prisoners' First Amendment rights would "have significant ripple effects" on prison resources. But in addition to the points in Quinn's opening brief, *see* Opening Br. 49-51, this Court should "view with extreme skepticism the argument" that exempting courts from the control-number policy would "impose[ ] an undue burden on prison resources and staff" given that Defendants purportedly *already* exempt federal courts from it. *Whitney*, 882 F.2d at 1077. Defendants offer no explanation for why exempting state-court mail would "impose[ ] an undue burden on prison resources and staff" that exempting federal-court mail does not. *Id.*; *see* Resp. Br. 40. If anything, uniformly applying the exemption to *all* courts may benefit Defendants: prison staff would not have to check each and every time whether court mail is from a federal or state court and apply differing rules. Certainly, ODRC's consistent failure to apply this arbitrary distinction inspires no

24

confidence, as federal courts have continued to reprimand ODRC for not following its so-called "exemption" for federal courts even well after *Allah* and any purported policy change. *See, e.g.*, Order at 4, Dkt. No. 39, *Picard v. DeWine*, No. 1:24-cv-2242 (N.D. Ohio July 23, 2025) (noting that the plaintiff there "received copied mail from a federal court, opened outside of his presence" after ODRC's purported policy change, and that "[t]his is a problem, as, once again, ODRC's current practices do not match its current policies").

*Third*, Defendants assert (at 48) that Quinn offers no "feasible alternatives" other than returning to the old policy. That mischaracterizes Quinn's position. Quinn does not ask Defendants to abandon the control-number policy altogether. He asks only that courts be exempted—a targeted accommodation that leaves the policy intact for attorneys and other senders. This is exactly what ODRC purports to *already* do for federal courts, proving the alternative can be administered at *de minimis* cost. And the feasibility of this alternative is confirmed by virtually *every other jurisdiction*, a point Defendants do not even attempt to address. *See* Opening Br. 53; *Turner*, 482 U.S. at 98 (citing the regulations of other jurisdictions as "obvious, easy" alternatives). Defendants never explain why they—alone—must require state, but not federal, courts to obtain individual control numbers to maintain institutional security. That is because there *is* no good explanation. Defendants' refusal to take this step while every other state, the District of Columbia, and the

25

federal Bureau of Prisons functions without any such requirement is the definition of an " 'exaggerated response' to prison concerns."  *Id.* at 90.

**IV.  Defendants Are Not Entitled To Qualified Immunity.**

The District Court was right to hold that Defendants are not entitled to qualified immunity because "the Policy at issue does not square with the Sixth Circuit's express holding in *Sallier*."  Summ. J. Order, R.50, PageID#434.

Defendants' arguments that *Stanley* controls and that *Sallier* is inapposite are wrong, as explained above.  *See supra* pp. 8-18.  Beyond that, Defendants point (at 42-44) to one district-court holding and one out-of-circuit holding that they claim show it was not clearly established when Quinn's court mail was opened outside his presence that such actions violated his First Amendment rights.  Of course, "[w]here Sixth Circuit law is clear, it controls," and that is the end of the matter.  *Kent*, 810 F.3d at 397.  "Reasonable officers in this circuit will pay attention to *this* [C]ourt's caselaw.  After all, that's the law that governs their actions."  *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) (emphasis added).

Because *Sallier* clearly established that court mail "constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically

requested otherwise," Defendants are not entitled to qualified immunity.[4] 343 F.3d at 877.

*  *  *

In the end, Defendants attempt (at 53-57) to undersell the chaos that their control-number policy has caused prisoners statewide—chaos noted with concern by multiple courts over the years. *See, e.g.*, Order at 1, Dkt. No. 23, *Picard*, No. 1:24-cv-2242 (N.D. Ohio June 10, 2025) ("It is clear that there is a problem with inmates being able to receive litigation related mail, from this case and others filed throughout the state."). Although this case is about Quinn and the relief he seeks, the problems he has experienced with his court mail are far from unique.

This Court should give effect to the constitutional principle it announced in *Sallier*: that a prisoner's court mail cannot be opened, read, and potentially tampered with outside his presence. 343 F.3d at 877. ODRC cannot circumvent that holding simply because courts have declined to navigate an administrative obstacle course of ODRC's own making.

---

[4] In any event, qualified immunity "only immunizes defendants from monetary damages—not injunctive or declaratory relief." *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 302 (6th Cir. 2019) (citation modified). "[T]he qualified immunity doctrine does not preclude [Quinn] from" "pursu[ing] the injunctive and declaratory relief that he has also requested in his § 1983 claim." *Id.*

**CONCLUSION**

The Court should reverse.

June 8, 2026

Respectfully submitted,

/s/ *Jessica C. Huang*

NEAL KUMAR KATYAL
JESSICA C. HUANG
   *Counsel of Record*
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7595
jhuang@milbank.com

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

June 8, 2026

/s/ *Jessica C. Huang*
Jessica C. Huang

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on June 8, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

June 8, 2026

/s/ *Jessica C. Huang*
Jessica C. Huang

*Counsel for Plaintiff-Appellant*